**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE TRUST UNDER WILL OF WALLACE   )
B. FLINT FOR THE BENEFIT OF          ) C.A. No. 10593-VCL
KATHERINE F. SHADEK               )

**OPINION**

Date Submitted: March 20, 2015
Date Decided: June 17, 2015

Todd A. Flubacher, Kimberly Gill McKinnon, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware; *Attorneys for Petitioner.*

**LASTER, Vice Chancellor.**

The current income beneficiary of a testamentary trust petitioned for an order that would modify the trust's terms by rewriting its administrative provisions, thereby converting the trust from the traditional, trustee-managed structure that the settlor contemplated into a directed trust where the trustee would serve only an administrative role. The petition also seeks an order providing that Delaware law will govern the administration of the trust unless the application of Delaware law "would or might" have adverse tax consequences, in which case New York law—the law that originally governed the trust under the settlor's estate plan—would spring back into effect. The petition is denied.

## I. FACTUAL BACKGROUND

Wallace B. Flint established a detailed estate plan in his Last Will and Testament dated December 12, 1934 (the "Will"). Among other things, the Will created a testamentary trust that would receive as its corpus the residue of his estate (the "Trust").

### A. The Terms Of The Trust

The Will contains detailed provisions for the Trust, reflecting Wallace's careful attention to how he wanted the residue of his estate distributed after his death. The initial purpose of the Trust was to provide income for his wife, Margaret McClenahan Flint, for the duration of her life. Article SEVENTH of the Will stated:

> All the rest, residue and remainder of my estate, whether real, personal or mixed, and wheresoever situate, I give, devise and bequeath to my Trustees herein-after named, their successor or successors, in trust nevertheless, to invest and reinvest the same during the term of natural life of my said wife MARGARET McCLENAHAN FLINT, and during such term to pay over to her the net rents, income and profits thereof in monthly or quarterly installments as my said Trustees may determine.

1

Under the plain language of this provision, Wallace expected his trustees to determine how to invest the corpus of the Trust.

Wallace provided that after Margaret's death, the Trust would continue for the benefit of his daughter, Katherine Frances Flint (now Katherine F. Shadek), and provide income to her for the duration of her life. Article EIGHTH stated:

> Upon the death of my said wife MARGARET McCLENAHAN FLINT …, I give, devise and bequeath my said estate to my said Trustees, their successor or successors, in further trust nevertheless, to invest and reinvest the same during the term of the natural life of my daughter KATHERINE FRANCES FLINT and during such term to pay over to her the net rents, income and profits thereof in monthly or quarterly installments as my Trustees may determine, except that during the minority of my said daughter such payments shall be made to her testamentary guardian hereinbelow named.

Once again, under the plain language of this provision, Wallace expected his trustees to determine how to invest the corpus of the Trust.

Under Article EIGHTH, Wallace gave Katherine two opportunities to invade the principal of the Trust. Upon attaining age thirty-five, she could direct that the trustees divide the corpus into fourths and pay one fourth over to her. Upon attaining age forty, she again could direct that the trustees divide the corpus into fourths and pay another fourth over to her. By providing these opportunities, Wallace recognized that Katherine might desire some degree of control over property being used for her benefit, and so he created two chances for her to obtain control over what works out to approximately 44% of the corpus ($¼ + (¼ * ¾)$). Notably, Wallace did not permit Katherine to access the entire corpus, nor did he otherwise authorize her to direct how the corpus of the Trust would be invested.

In Article NINTH of the Will, Wallace granted Katherine a testamentary power of appointment over the corpus of the Trust that remained at her death. Wallace took care to address what would happen if Katherine failed to exercise her power. He specified two alternatives. If Katherine had lawful descendants, then the trustees would divide the Trust corpus and pay it over to them *per stirpes*. If she did not, then the trustees would divide the Trust corpus and pay it over, *per stirpes*, to five different individuals whom Wallace named. Three were the children of his cousin, Henry D. Scribner, and two were the children of his brother-in-law, Henry Molwitz.

In Article THIRTEENTH, Wallace granted the trustees a limited power to invade the Trust corpus for the benefit of his wife or daughter if the trustees deemed it appropriate in their sole discretion. Notably, Wallace limited the amount to a maximum of $10,000 in any calendar year. By imposing this limit, Wallace ensured that the bulk of Trust corpus would remain intact and under the direction of his trustees so that his estate plan could be carried out.

Evidencing his desire to have trustworthy persons exercise judgment over the Trust corpus, Wallace provided in his Will that the initial trustees would be Henry Scribner, Henry Molwitz, Margaret, and the Chemical Bank and Trust Company, a New York corporate trustee. Wallace did not make Margaret, initially the only income beneficiary, the sole trustee.

## B.   The Trust Migrates To Delaware.

After Wallace died, the Surrogate's Court of the State of New York, Queen's County (the "New York Court"), issued letters of trusteeship dated February 16, 1938, to

the initial trustees. By instrument dated June 10, 1949, Katherine restricted her testamentary power of appointment to an exercise in favor of her spouse, descendants, and donees.

After Henry Scribner and Margaret died, the New York Court appointed Katherine as a successor co-trustee. After Henry Molwitz died, Katherine and Chemical Bank continued as the sole remaining co-trustees.

As noted, Katherine had the power to obtain (i) a distribution of one-fourth of the Trust corpus when she turned thirty-five and (ii) a distribution of one-fourth of the remaining corpus when she turned forty. She did not exercise either power. Today, Katherine has four adult children who are the presumptive remainder beneficiaries under the Trust. She has grandchildren who are contingent remainder beneficiaries. She has potential additional descendants, as yet unborn and perhaps not even contemplated. They are also contingent remainder beneficiaries.

In 2001, Katherine and Chemical Bank took steps to move the Trust to Delaware. They obtained an order from this court dated October 5, 2001, that provisionally approved the change of the Trust's situs. It stated:

> (A) Chase Manhattan Bank USA, N.A. shall be appointed successor co-trustee of the Trust and this Court shall accept jurisdiction over the Trust at such time as the Surrogate's Court of New York, Queens County, enters an Order authorizing (i) The Chase Manhattan Bank to resign as trustee, and (ii) the change of the situs of the Trust to Delaware; and

> (B) following the revocation of her Letters of Trusteeship by the Surrogate's Court of New York, Queen's County, this Court affirms the continuation of Katherine F. Shadek as trustee of the Trust.

4

Obtaining the New York order took some time. Nearly one year later, on September 25, 2002, the New York Court entered an order that provided as follows:

(1)     Katherine F. Shadek and JPMorgan Chase Bank are hereby given leave to transfer the situs of the Trust to the State of Delaware for administration thereof under the jurisdiction of the Court of Chancery of the State of Delaware, County of New Castle and the assets comprising the corpus of the Trust shall be transferred to Katherine F. Shadek and J.P. Morgan Trust Company of Delaware, as Trustees.

(2)     JPMorgan Chase Bank, successor in interest to The Chase Manhattan Bank, is hereby authorized to resign as co-Trustee.

(3)     J.P. Morgan Trust Company of Delaware shall be appointed successor co-Trustee upon the transfer of the Trust pursuant to the terms of the order of the Court of Chancery of the State of Delaware, County of New Castle.

(4)     The Letters of Trusteeship issued to Katherine F. Shadek and The Chase Manhattan Bank (now known as JPMorgan Chase Bank), shall be revoked upon the appointment as co-Trustees of Katherine F. Shadek and J.P. Morgan Trust Company of Delaware by order of the Court of Chancery of the State of Delaware, County of New Castle.

Approximately one month later, Katherine and Chemical Bank obtained an additional order from this court dated October 29, 2002 (the "2002 Order"). It declared that effective as September 25, 2002, the date of the New York Court's order, the following items were true:

(A)     J.P. Morgan Trust Company of Delaware and Katherine F. Shadek are appointed as successor co-trustees of the Trust;

(B)     this Court has accepted jurisdiction over the Trust; and

(C)     Sections 3302, 3312, 3313 and 3402 of Title 12 of the Delaware Code shall govern all matters concerning the administration of the Trust that are addressed thereunder, and New York law shall continue to govern all other matters concerning the administration of

5

the Trust; provided, however, that the co-trustees shall not be required to account in any court other than one of the courts of the State of Delaware.

Although the entry of the 2002 Order reflected this court's practice at the time when evaluating trust consent petitions, Delaware decisions have held subsequently that a petition seeking consensual declarations that do not require judicial implementation does not give rise to an actual controversy supporting declaratory relief.[1]

## C.   The Trust's Concentrated Corpus

Approximately 81% of the fair market value of the Trust corpus is invested in the stock of International Business Machines Corporation ("IBM"). Wallace's brother, Charles Flint, founded Computing Tabulating Recording Company in 1911, which was renamed IBM in 1924. When Wallace died, shares of IBM stock formed a preponderance of the corpus.

JP Morgan has recommended diversifying the Trust. Katherine and her children do not want to diversify the Trust. Although the Trust is not a directed trust, JP Morgan has acceded to their wishes. To hedge against a decline in the value of the stock, JP Morgan has been entering annually into principal installment stock monetization transactions, which the petition labels "PrISM" transactions. The PrISM transactions have not been described in detail.

---

[1] *See In re In re Peierls Family Inter Vivos Trusts*, 77 A.3d 249, 266-67 (Del. 2013). *See generally* 10 *Del. C.* § 6504; *Rollins Int'l Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).

The plain language of the Trust appears to contemplate that the trustees can retain the IBM stock. Article SIXTEENTH of Wallace's Will provides that his trustees can continue to hold investments that he held. It states:

> [M]y Trustees as well and [their] successors . . . shall have full power and authority in their absolute and uncontrolled discretion to hold and retain any property coming into their hands hereunder in the same form of investment as that in which it may exist at the time of my death although it may not be of the character of investment permitted by law to Trustees . . . .

Article SIXTEENTH does not say that the trustees can retain an investment that Wallace held even if they believe that it would be in the best interests of the Trust to sell it.

In recent years, JP Morgan has insisted that additional steps be taken in light of Katherine and her children's desire to maintain the Trust's concentrated investment in IBM stock. First, the trustees distanced themselves from the actual investment decisions. In 2012, they delegated to Laurence A. Shadek and James M. Shadek, two of Katherine's adult children, "all duties and powers in connection with the investment of the assets of the Trust," including but not limited to a list of specific types of investments (the "Investment Managers"). Katherine's adult children, including Laurence and James, signed the delegations to Laurence and James on behalf of themselves and their descendants.

Second, in each of the last four years, Katherine and her adult children have entered into consent, release, and indemnification agreements with JP Morgan and with Laurence and James in their capacities as Investment Managers. Through these agreements, Katherine and her adult children approved and consented to the concentration of the Trust corpus, released JP Morgan and the Investment Managers from

7

any liability, and agreed to indemnify JP Morgan and the Investment Managers against any claims arising out of (i) the decision not to diversify the Trust's investments other than through the PrISM transactions, (ii) the PrISM transactions themselves, and (iii) the delegation of investment authority to the Investment Managers. Katherine's children signed the delegations on behalf of themselves and their descendants.

## D.     The Petition To Modify The Trust

By petition dated October 24, 2014, Katherine sought to modify the terms of the Trust. The brief in support of the petition stated that the changes are "intended to formalize the current investment management structure and replace the ad hoc mechanism of delegations of investment responsibilities to the Investment Managers which requires the annual burden of drafting and executing consent, release and indemnification agreements between all interested parties."

To achieve this result, the petition asks the court to approve a document titled the "Modified and Restated Last Will and Testament of Wallace B. Flint." The petition shortens this to the "Restated Will." Both are newspeak. The new document would no longer be the Last Will and Testament of Wallace B. Flint. It would be a new will and testament, written for him by Katherine's current lawyers, eighty-one years after his death.

The Restated Will would differ substantially from the original Will. Its length more than doubles from the original Will's nine pages to the Restated Will's nineteen. The additional bulk comes from four new articles that convert the Trust from a traditional trustee-managed structure into a directed trust. The heart of the change is a new Article

TWENTY-SEVENTH, which creates the position of Investment Advisor, appoints Laurence as the initial Investment Advisor, and provides that Katherine and her adult children shall have the power by majority vote to appoint a new investment advisor.

Section C of the new Article TWENTY-SEVENTH directs the trustees to exercise their investment powers only as directed by the Investment Advisor:

> (C)    Investment Direction. My Trustees shall exercise all investment powers granted to it under Sections (2) through (5), and (7) through (14) of Section 3325 of Title 12 of the Delaware Code[2] or any successor provision thereto, all

---

[2] These sections provide as follows:

> Without limiting the authority conferred by § 3324 of this title, a trustee may:
>
> …
>
> (2) Acquire or sell property, for cash or on credit, at public or private sale;
>
> (3) Exchange, partition or otherwise change the character of trust property;
>
> (4) Deposit trust funds in an account in a regulated financial services institution, including an institution operated by or affiliated with the trustee;
>
> (5) Borrow money, with or without security, and mortgage or pledge trust property for a period within or extending beyond the duration of the trust;
>
> …
>
> (7) With respect to an interest in a proprietorship, partnership, limited liability company, statutory trust, business trust, corporation or other form of business or enterprise, continue the business or other enterprise and take any action that may be taken by shareholders, members or property owners, including merging, dissolving or otherwise changing the form of business organization or contributing additional capital;

(8) With respect to stocks or other securities, to exercise the rights of an absolute owner, including the right to:

a. Vote, or give proxies to vote, with or without power of substitution, or enter into or continue a voting trust agreement;

b. Hold a security in the name of a nominee or in other form without disclosure of the trust so that title may pass by delivery;

c. Pay calls, assessments and other sums chargeable or accruing against the securities, and sell or exercise stock subscription or conversion rights; and

d. Deposit the securities with a securities depository or other regulated financial services institution;

(9) With respect to an interest in real property, construct, make ordinary or extraordinary repairs, alterations or improvements in buildings or other structures, demolish improvements, raze existing or erect new party walls or buildings, subdivide or develop land, dedicate land to public use or grant public or private easements, and make or vacate plats and adjust boundaries;

(10) Enter into a lease for any purpose as lessor or lessee, including a lease or other arrangement for exploration and removal of natural resources, with or without the option to purchase or renew, for a period within the duration of the trust;

(11) Grant an option involving a sale, lease or other disposition of trust property or take an option for the acquisition of property, excluding an option exercisable beyond the duration of the trust, and exercise an option so acquired;

(12) Insure the property of the trust against damage or loss and insure the trustee, the trustee's agents and beneficiaries against liability arising from the administration of the trust;

(13) Abandon or decline to administer property of no value or of insufficient value to justify its collection or continued administration;

(14) With respect to possible liability for environmental conditions:

10

> powers granted in Articles SIXTEENTH and TWENTIETH of this my will [sic], and all other powers relating to the acquisition, disposition, retention, exchange, change in character, lending, borrowing, pledging, mortgaging, managing, voting, leasing, granting of options with respect to, insuring, abandoning, or in any other way relating to the investment or management of the trust estate, only upon the written direction of the [I]nvestment [A]dvisor . . . .

(Footnote added). In his actual Will, Wallace placed the trustees in charge of investing the Trust's corpus. The original Will did not contemplate the position of Investment Advisor or the concept of a directed trust, nor did it incorporate statutory language post-dating Wallace's death.

Section D of the new Article TWENTY-SEVENTH relieves the trustees of any duty to monitor the Investment Advisor:

---

> a. Inspect or investigate property the trustee holds or has been asked to hold, or property owned or operated by an entity in which the trustee holds or has been asked to hold an interest, for the purpose of determining the application of environmental law with respect to the property;
>
> b. Take action to prevent, abate or otherwise remedy any actual or potential violation of any environmental law affecting property held directly or indirectly by the trustee, whether taken before or after the initiation of a claim or governmental enforcement action;
>
> c. Decline to accept property into trust or to disclaim any power with respect to property that has or may have environmental liability attached;
>
> d. Compromise claims against the trust which may be asserted for an alleged violation of environmental law; and
>
> e. Pay the expense of any inspection, review, abatement or remedial action to comply with environmental law . . . .

12 *Del. C.* § 3325.

11

(D)    Trustee Has No Duty to Monitor. My Trustees shall have no responsibility to undertake any review of, or to provide advice regarding, any part of the trust estate subject to the direction of the Investment adviser. My Trustees shall have no duty or obligation to (a) communicate with or warn any beneficiary or any third party concerning instances in which my Trustees would or might have exercised their discretion in a manner different than the manner exercised by the Investment Advisor, (b) to inquire into or monitor the directions of the Investment Adviser notwithstanding any appearance of or actual conflict of interest of the Investment Advisor, or (c) inquire into, monitor or question the prudence of or inform any beneficiary with respect to the investment of the trust estate subject to the direction of the Investment Advisor, and any and all review of the investments by my Trustees shall be presumed to be solely for statement, tax reporting and/or other administrative purposes. My Trustees shall have no duty to seek the direction of the Investment Advisor in the absence of any direction. My Trustees shall be entitled to the full protection of Section 3313(e) of Title 12 of the Delaware Code[3] without limitation. This Article has been

---

[3] This section provides as follows:

Whenever a governing instrument provides that a fiduciary is to follow the direction of an adviser with respect to investment decisions, distribution decisions, or other decisions of the fiduciary, then, except to the extent that the governing instrument provides otherwise, the fiduciary shall have no duty to:

(1) Monitor the conduct of the adviser;

(2) Provide advice to the adviser or consult with the adviser; or

(3) Communicate with or warn or apprise any beneficiary or third party concerning instances in which the fiduciary would or might have exercised the fiduciary's own discretion in a manner different from the manner directed by the adviser.

Absent clear and convincing evidence to the contrary, the actions of the fiduciary pertaining to matters within the scope of the adviser's authority (such as confirming that the adviser's directions have been carried out and recording and reporting actions taken at the adviser's direction), shall be presumed to be administrative

12

included in order to effectively bifurcate the investment function from other functions of my Trustees in order for investment decisions to be made by the Investment Adviser without the interference of my Trustees.

(Footnote added). In his actual Will, Wallace placed the trustees in charge of the Trust. The Restated Will not only alters this arrangement, but it justifies it by referring to the trustees' management and oversight of the Trust as "interference." That is a strange choice of words.

Section E of the new Article TWENTY-SEVENTH directs the trustees to robo-sign documents provided to them by the Investment Advisor:

> (D)   My Trustees shall execute all documents necessary or appropriate in connection with any matter that is the subject of directions from the Investment Advisor, including, without limitation, making any representation, warranty or covenant required in order to make or maintain any investment of the trust, and any future action with respect to any such representation, warranty or covenant, only as directed by the Investment Adviser. My Trustees shall have no duty to conduct any independent review of documents presented to it [sic] by the Investment Adviser in furtherance of the Investment Adviser's written instruction to my Trustees and shall sign the same as presented. Further, the Investment Adviser shall have the authority to direct my Trustees with regard to amending, securing, paying, and otherwise dealing with any debts, promissory notes, and other obligations of the trust. My Trustees shall act solely at the direction of the

---

> actions taken by the fiduciary solely to allow the fiduciary to perform those duties assigned to the fiduciary under the governing instrument and such administrative actions shall not be deemed to constitute an undertaking by the fiduciary to monitor the adviser or otherwise participate in actions within the scope of the adviser's authority.

12 *Del. C.* § 3313(e).

> Investment Adviser in executing and delivering any and all documents in connection with any matter that is the subject to direction from the Investment Adviser, such as purchase and sale agreements, necessary or convenient to, or otherwise prepared in connection with, the purchase, sale, exchange, transfer, pledge or other disposition or encumbrance of trust investments and in making any and all representations and warranties appearing in any such documents.

In his original Will, Wallace contemplated that the trustees would exercise judgment and discretion, not act as marionettes for the Investment Advisor.

A new Article TWENTY-EIGHTH exculpates the trustees from all liability when acting at the direction of the Investment Advisor "except in cases of such Trustee's own willful misconduct." The same new article provides broad indemnification and advancement rights to the trustees and former trustees for "any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of the preceding paragraph or to which the Trustee is made a party, or threatened to be made a party, by reason of serving as Trustee." The original Will did not provide the trustees with such an extensive degree of insulation from accountability to their beneficiaries.

Finally, a new Article TWENTY-FIFTH broadens the powers of the Investment Advisor by providing that the Investment Advisor may direct the trustees

> to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden or would be regarded as imprudent, improper, or unlawful by the "prudent person" rule, "Prudent investor" rule, Section 3302 of Title 12 of the Delaware Code,[4] any rule or

---

[4] This section provides as follows:

14

(a) When investing, reinvesting, purchasing, acquiring, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account. In making investment decisions, a fiduciary may consider the general economic conditions, the anticipated tax consequences of the investment and the anticipated duration of the account and the needs of its beneficiaries.

(b) Within the limitations of the foregoing standard and considering individual investments as part of an overall investment strategy, a fiduciary is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, wherever located, whether within or without the United States, including, but not by way of limitation, bonds, debentures and other corporate obligations, stocks, preferred or common, shares or interests in common funds or common trust funds, securities of any open-end or closed-end management type investment company or investment trust registered under the Federal Investment Company Act of 1940 (15 U.S.C. § 80a-1 et seq.), options, futures, warrants, limited partnership interests and life insurance. No investment made by a fiduciary shall be deemed imprudent solely because the investment is not specifically mentioned in this subsection.

(c) The propriety of an investment decision is to be determined by what the fiduciary knew or should have known at the time of the decision about:

(1) The inherent nature and expected performance of the investment portfolio;

(2) The limitations of the standard set forth in subsection (a) of this section; and

(3) The nature and extent of other investments and resources, whether held in trust or otherwise, available to the beneficiaries as they existed at the time of the decision; provided however, that the fiduciary shall have no duty to inquire as to the nature and extent of any such other investments and resources not held by the fiduciary or held by the fiduciary in a trust or trust account subject to the direction of an adviser authorized to direct the fiduciary with respect to investment decisions, within the meaning of § 3313(d) of this title, concerning the assets held in the trust or trust account.

Any determination of liability for investment performance shall consider the performance of the entire portfolio and such other factors as the fiduciary considered when the investment decision was made.

(d) Notwithstanding the foregoing provisions of this section, a trustee who discloses the application of this subsection and the limitation of the trustee's duties thereunder either in the governing instrument or in a separate writing delivered to each insured at the inception of a contract of life insurance or thereafter if prior to an event giving rise to a claim thereunder, may acquire or retain a contract of life insurance upon the life of the trustor or the trustor's spouse, or both, without liability for a loss arising from the trustee's failure to:

(1) Determine whether the contract is or remains a proper investment;

(2) Investigate the financial strength or changes in the financial strength of the life insurance company;

(3) Make a determination of whether to exercise any policy option available under the contract;

(4) Make a determination of whether to diversify such contracts relative to 1 another or to other assets, if any, administered by the trustee; or

(5) Inquire about changes in the health or financial condition of the insured or insureds relative to any such contract.

(e) Any fiduciary acting under a governing instrument shall not be liable to anyone whose interests arise from that instrument for breach of fiduciary duty for the fiduciary's good faith reliance on the express provisions of such instrument. The standards set forth in this section may be expanded, restricted or eliminated by express provisions in a governing instrument.

(f) Where a bank or trust company acting in a fiduciary capacity invests trust funds in, or otherwise acquires an interest in, a common trust fund which it or 1 of its affiliates manages, as defined in § 23A of the Federal Reserve Act (12 U.S.C. § 371c), the plan for such common trust fund shall be filed and recorded in the office of the Register in Chancery of the county in which is located the main office in Delaware of the bank or trust company which is the fiduciary for such trust funds.

(g) Fees may be charged for making an investment through a computerized or automated process, such as sweeping otherwise uninvested cash into a cash management vehicle, provided that the amount of such fees is disclosed on a continuing basis as a separate item on the regular periodic statements furnished to the beneficiaries of the account.

(h) A fiduciary is authorized, in the absence of an express provision to the contrary, whenever a law, regulation, governing instrument or order directs, requires, authorizes or permits investment in United States government

law concerning the duty of loyalty or any other rule or law which restricts a fiduciary's capacity to invest.

(Footnote added). The original Will did not contemplate this expansive degree of investment authority. Moreover, given the broad range of investment authority contemplated by Section 3302, it seems odd to expand it further, and particularly extreme to encompass investments that otherwise would be "unlawful."

Ironically, the Restated Will would continue to bear Wallace's signature and the signatures of his three original witnesses. It also would continue to recite that it was "SIGNED, SEALED, PUBLISHED AND DECLARED by [Wallace] . . . in his presence and in the presence of [the witnesses] this 12th day of December, 1934." That would no longer be true.

---

obligations, to invest in those obligations, either directly or in the form of securities of, or other interests in, any open-end or closed-end management investment company or investment trust registered under the Investment Company Act of 1940 (54 Stat. 847, 15 U.S.C. § 80a-1 et seq.), if the portfolio of that investment company or investment trust is limited to United States government obligations and to repurchase agreements fully collateralized by United States government obligations, which collateral shall be delivered to or held by the investment company or investment trust, either directly or through an authorized custodian.

(i) Except in the case of United States government obligations, which are treated in subsection (h) of this section above, the authority to invest in specified types of investments includes authorization to invest in any open-end or closed-end management investment company or investment trust registered under the Investment Company Act of 1940 (54 Stat. 847, 15 U.S.C. § 80a-1 et seq.), or in any common or collective trust fund established and maintained by a corporate fiduciary, if the portfolio of the investment company or investment trust, or of the common or collective trust fund, consists substantially of the specified types of investments and is otherwise in conformity with the laws of the State.

12 *Del. C.* § 3302.

## E.    The Modification Of The 2002 Order

In addition to modifying the trust through the creation of the Restated Will, Katherine wishes to modify the 2002 Order's declaration regarding the law governing the Trust. Rather than choosing a single state's law to govern the administration of the Trust, the 2002 Order picked two. Delaware law governed the matters set forth in Sections 3302, 3312, 3313 and 3402 of Title 12 of the Delaware Code, and New York law continued to govern all other administrative matters.

In the petition, Katherine asks for a more amorphous, complex, and unpredictable division in the form of language that would provide as follows:

> Delaware law shall govern all matters pertaining to the administration of the Trust except those matters concerning administration which, if the law governing administration were changed from New York to Delaware law, would or might change the time of the vesting of interests in the property of the Trust, extend the duration of the Trust, or shift a beneficial interest in the Trust to any beneficiary who occupies a lower generation (as defined in Section 261 of the Internal Revenue Code of 1986, as amended), than the person or persons who held the beneficial interest prior to the change in the law governing administration, and all matters concerning the validity and construction of the Trust, and all matters concerning administration excepted from the application of Delaware law pursuant to the foregoing provisions, shall continue to be governed by new York law; provided, however, that the co-trustees shall not be required to account to any court other than one of the courts of the State of Delaware.

As a practical matter, this language would create a contingent choice of law provision, in which Delaware law would govern all issues of administration unless it "would or might" create adverse tax affects, in which case the law governing that particular issue would revert back to New York.

18

## II.  LEGAL ANALYSIS

This case presents two issues: the modification of the Trust and the modification of the 2002 Order. Both requests are denied.

### A.  The Modification Of The Trust

The petition seeks to modify the Trust by having the court adopt the Restated Will. The supporting brief stresses that the petition seeks *modification*, not reformation, and candidly defines a modification as any change to a trust that departs from its original terms. Katherine thus admits that she wants to rewrite Wallace's estate plan so that it says what she wants it to say, and she claims she should be able to do so simply because she and her adult children agree.

The problem with this approach is that it conflicts with Wallace's intent. When he drafted his Will, he did not create a directed trust in which the beneficiaries picked an Investment Advisor—here, one of themselves—and the trustees simply did whatever the Investment Advisor said. Wallace's Trust contemplates that the trustees will use their judgment when investing and re-investing the Trust corpus. The beneficiaries are not supposed to exercise the degree of control over the Trust that the Restated Will would give them. Wallace's actual Will evidences his intent by placing limitations on Katherine's ability to access the corpus and limiting the trustees' power to invade principal on Katherine's behalf. The most direct control Katherine could have was over 44% of the Trust corpus, and to get it she had to elect to receive one-fourth at age thirty-five and one-fourth of the remainder at age forty. The most the trustees can do to invade principal on Katherine's behalf is a maximum of $10,000 per calendar year.

Wallace plainly intended for the Trust to benefit from the expertise and judgment of individuals whom he trusted and who were not beneficiaries, like Henry Scribner and Henry Molwitz. He also plainly intended for the Trust to benefit from the involvement of a corporate trustee that actually would fulfill a trustee's traditional role. The use of independent trustees and the involvement of a corporate trustee have been thought to provide meaningful protection against mismanagement and self-dealing.

Doubtless Katherine and her adult children have good reasons for wanting to change Wallace's estate plan. Under the quite different administrative structure that the petition advocates, a corporate trustee likely would charge far lower fees, because its responsibilities would be reduced from those of a real trustee to those of an administrative agent. Although short-term savings can have long-term costs, the costs of re-writing Wallace's estate plan are currently distant and contingent. The savings are immediate and tangible.

Whether the wishes of living beneficiaries should prevail over the wishes of a dead settlor is a contestable issue where reasonable minds can disagree. Different jurisdictions have reached different results. English law has long made the wishes of the beneficiaries paramount. *See Saunders v. Vautier*, 49 Eng. Rep. 282 (Ch. 1841). By contrast, under the *Claflin* doctrine, the majority rule in the United States has long prioritized the settlor's intent. *See Claflin v. Claflin*, 20 N.E. 454 (Mass. 1889). Recent statutory initiatives, including the Uniform Trust Code, have eroded the *Claflin* doctrine and moved towards prioritizing the wishes of beneficiaries. *See generally* Richard C.

Ausness, *Sherlock Holmes and the Problem of the Dead Hand: The Modification and Termination of "Irrevocable Trusts,"* 28 Quinnipiac Prob. L.J. 327 (2015).

In Delaware, the settlor's intent controls. Our Supreme Court has stated repeatedly that "[t]he cardinal rule of law in a trust case is that the intent of the settlor."[5] Our Trust Code makes it the policy of the State of Delaware "to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments." 12 *Del. C.* § 3303(a). It would undercut this policy, and might well be described as duplicitous, for our State to represent to a settlor that our law will respect his dispositions and enforce his governing instrument, only to enable his beneficiaries to rewrite that instrument after his death.

Delaware obviously permits a settlor to create a new trust containing all of the features that the petition seeks to implement. Re-writing an existing trust to incorporate those features, contrary to the settlor's intent as manifested by the instrument that the settlor executed, is a different matter.

1. **Prior Consent Decrees**

In an effort to persuade the court to grant the relief sought, the petition cites a laundry list of orders and suggests that court previously granted the type of relief that the petition requests. A rote listing of orders is not persuasive. Many date from a period when this court routinely granted relief to which all parties consented, without independently

---

[5] *Chavin v. PNC Bank*, 816 A.2d 781, 783 (Del. 2003) (internal quotation marks omitted); *accord Annan v. Wilm. Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989); *Dutra de Amorim v. Norment*, 460 A.2d 511, 514 (Del. 1983).

testing whether there was a live dispute or similar basis for jurisdiction and without examining carefully whether there were adequate grounds for the relief requested. All pre-dated the *Pierels* decisions[6] and the adoption of a statutory mechanism for nonjudicial settlement.[7] They are not precedential.

## 2. **Other Doctrines**

Next, the petition cites a number of other doctrines and contends that they support relief in this case. Recognizing that none apply, the petition does not actually rely on any of them. Rather, the petition contends that when taken together, they imply the existence of a judicial power to rewrite a trust when all current beneficiaries consent. Put differently, the petitioner perceives within the penumbra of these doctrines the ability to modify a trust by consent. To my mind, the doctrines' limited reach supports the opposite inference, namely that Delaware law does not countenance wholesale consensual modification and only departs from the settlor's intent in narrow circumstances.

### a) **Reformation**

"Trust reformation is an equitable remedy and is an ordinary remedy for mistake in the terms of a trust instrument." 90 *C.J.S. Trusts* § 92 (footnotes omitted). "A trust may be rescinded or reformed upon the same grounds as those upon which a transfer of

---

[6] *See In re Peierls Family Inter Vivos Trusts*, 59 A.3d 471 (Del. Ch. 2012), *aff'd in part & rev'd in part*, 77 A.3d 249 (Del. 2013); *In re Ethel F. Peierls Charitable Lead Unitrust*, 59 A.3d 464 (Del. Ch. 2012), *aff'd sub nom. In re Peierls Charitable Lead Unitrust*, 77 A.3d 232 (Del. 2013); *In re Peierls Family Testamentary Trusts*, 58 A.3d 985 (Del. Ch. 2012), *aff'd in part & rev'd in part*, 77 A.3d 223 Del. 2013).

[7] *See* 79 Del. Laws, c. 172, § 2 (2013).

property not in trust may be rescinded or reformed." *Restatement (Third) of Trusts* § 62. "Where no consideration is involved in the creation of a trust, it can be rescinded or reformed upon the same grounds, such as fraud, duress, undue influence, or mistake, as those upon which a gratuitous transfer of property not in trust can be rescinded or reformed." *Id.* cmt. a.

Delaware adheres to these principles and, with one exception, applies the traditional law of reformation to an application to reform a trust. *See Roos v. Roos*, 203 A.2d 140, 142 (Del. Ch. 1964). "It is a basic principle of equity that the Court of Chancery has jurisdiction to reform a document to make it conform to the original intent of the parties." *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990). Outside of the trust context, "reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence." *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del.Ch.1997) (internal quotation marks omitted).

> The doctrine of reformation for mistake with regard to trusts differs from instruments such as contracts in one important respect; in contract law, reformation will not be granted unless the parties' mistake is mutual, but mutuality of mistake is not always required where trusts are concerned, in that, because a settlor usually receives no consideration for the creation of a trust, a unilateral mistake on the part of the settlor is ordinarily sufficient to warrant reformation.

90 *C.J.S. Trusts* § 92 (footnote omitted); *accord Roos*, 203 A.2d at 142.

The Court of Chancery has the power to reform a voluntary trust instrument even after the death of the settlor, as long as the record "clearly and affirmatively establishes" the grounds for reformation. *Roos*, 203 A.2d at 143. Notwithstanding that all parties to a

23

case seek relief via consent petition, the petitioners still must introduce "clear and convincing evidence of the decedent's intent" in order to obtain reformation. *In re Estate of Tuthill*, 754 A.2d 272, 273 (D.C.Ct.App.2000). "Even though a unilateral mistake by the settlor is a sufficient ground for reforming a trust that was created without any consideration, the burden is nonetheless on the party seeking reformation to establish by clear and convincing evidence the mistake." 90 *C.J.S. Trusts* § 92 (footnote omitted).

The petition concedes that grounds for reformation do not exist here, because the Will accurately reflects Wallace's plan for his estate, including the terms he wished to establish for the Trust. But the petition argues that because the court has the power to reform a trust instrument under limited circumstances, it should assert and exercise the more expansive power to modify a trust instrument whenever all current beneficiaries consent. In my view, the limited circumstances under which a Delaware court will order reformation indicate the opposite and suggest that that modification is not freely available as a matter of convenience.

b)      **Common Law *Cy Pres***

*Cy pres* is a French phrase meaning "as near." The Delaware courts first applied common law *cy pres* in 1948.[8] Under that doctrine,

---

[8] *See Del. Trust Co. v. Graham*, 61 A.2d 110, 113–14 (Del. Ch. 1948); *see also* E.L. Fisch, *Cy Pres Comes to Delaware*, 9 Md. L. Rev. 359, 359 (1948). In 1979, the Delaware General Assembly established a statutory version of *cy pres* under the rubric of judicial modification. *See* 12 *Del. C.* § 3541. This decision discusses judicial modification separately. When adopting Section 3541, the General Assembly did not indicate to what degree the statute displaced common law *cy pres*, leading this Court to observe that "[i]t is unclear to what extent [the statute] is meant to abrogate the Delaware

24

where the general charitable purpose of a trust would fail due to a circumstance, unanticipated by the settlor, that renders the literal fulfillment of the trust impossible or impractical, the court may designate an alternative beneficiary "cy pres " (as near as may be) to the named beneficiary, to facilitate the settlor's general intent.

*PNC Bank, Del. v. N.J. State Soc. for Prevention of Cruelty to Animals*, 2008 WL 2891150, at *6 (Del. Ch. July 14, 2008). If, however, the settlor's "particular intent remain[s] possible, the bequest will be so applied. The general intention is of the last resort." S.A. Anderson, *The Cy Pres Doctrine as Affecting the Construction of Deeds and Wills*, 1 Colum. L.T. 8, 12 (1887) (citation omitted).

Because *cy pres* is a last resort, a court will not invoke the doctrine "merely because some imaginary benefit is anticipated from giving latitude to the language of the written instrument, or on any bare suggestion of expediency." *Id.* Only when it becomes "absolutely impossible to accomplish the particular purpose" of the trust will *cy pres* empower a court to craft an imperfect solution to make the trust functional. *Id.*

As with reformation, the petition does not rely on common law *cy pres*. That doctrine only can be invoked for charitable trust, which the Trust is not. Ronald Chester, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees,* § 431, at 118 (3rd ed. 2005) ("Cy pres has no application to private trusts...."). Once again, the

common law doctrine." *See PNC Bank, Del. v. N.J. State Soc. for Prevention of Cruelty to Animals*, 2008 WL 2891150, at *7 n. 18 (Del. Ch. July 14, 2008) (citing *In re Estate of du Pont*, 663 A.2d 470, 478 n. 14 (Del. Ch. 1994)). This decision need not address the continuing vitality of common law *cy pres* because the petitioner has referenced it only by way of illustration to indicate the type of reformative powers that the petitioner believes this court should wield. No one contends that common law *cy pres* applies on the facts of the case.

petition cites *cy pres* as indicative of a broad power to modify trusts that this court should wield freely. In my view, the doctrine is informative because it only permits modification in the limited circumstances where the literal fulfillment of the trust's purpose becomes impossible or impractical. Applied by analogy, this court should modify the Trust only if it is no longer possible to achieve Wallace's intent. No one claims that is the case.

### c) **Deviation**

The common law doctrine of deviation permits a departure from the literal terms of a trust "where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust."[9] As with reformation and common law *cy pres*, the petition does not rely on deviation directly but rather as suggesting unbridled equitable authority over trusts. To my mind, once again, the limitations of the doctrine suggest the opposite. A court could deviate from Wallace's estate plan only if his scheme became impossible or illegal. Neither has occurred.

### d) **Statutory Modification**

By statute, Delaware authorizes a court to modify a trust, including a noncharitable trust. The Trust Code provides as follows:

> (a) Subject to subsection (b) of this section, if a particular charitable purpose *or noncharitable purpose* becomes unlawful under the Constitution of this State or the United States or the trust would otherwise no longer

---

[9] *Bank of Del. v. Buckson*, 255 A.2d 710, 716 (Del. Ch.1969) (quoting William F. Fratcher, *Scott on Trusts*, § 383 (4th ed. 1989); *see* 12 Del. C. § 3306 (preserving common law doctrine of deviation).

serve any religious, charitable, scientific, literary, educational, *or noncharitable purpose*:

> (1) The trust does not fail in whole or in part;

> (2) The trust property does not revert to the trustor or the trustor's successors in interest; and

> (3) The Court of Chancery shall modify or terminate the trust and direct that the trust property be applied or distributed, in whole or in part, in a manner consistent with the trustor's charitable or noncharitable purposes, whether or not such purposes be specific or general.

(b) The power of the Court of Chancery to modify or terminate a charitable or noncharitable purpose trust, as provided in subsection (a) of this section, is in all cases subject to a contrary provision in the terms of the trust instrument, whether such contrary provision directs that the trust property be distributed to a charitable or noncharitable beneficiary.

(c) For purposes of this section, a "noncharitable purpose" is a purpose within the meaning of § 3555[10] or § 3556[11] of this title.

---

[10] Section 3555 authorizes trusts for the care of an animal. *See* 12 *Del. C.* § 3555.

[11] Section 3556 authorizes trusts for "Other Noncharitable Purposes." It states:

(a) In addition to the provisions of § 3555 of this title, a trust for a declared purpose that is not impossible of attainment is valid notwithstanding that the trust might not be deemed to be for charitable purposes.

(b) A trust authorized by subsection (a) of this section shall not be invalid because it lacks an identifiable person as beneficiary.

(c) A trust authorized by subsection (a) of this section may be enforced by a person appointed in the terms of the trust or, if there is no such person or if the last such person no longer is willing and able to serve, by a person appointed by the Court of Chancery. A person who has an interest in the declared purpose of the trust other than a general public interest may petition the Court of Chancery for an order that appoints a person to enforce the terms of the trust or to remove that person.

(d) Property of a trust authorized by this section may be applied only to its intended use. Upon the termination of the trust, any property of the trust

12 *Del. C.* § 3541 (emphasis added; footnotes supplied).

Section 3541 identifies the limited circumstances in which the General Assembly has granted the court the power to modify a trust. The statute prescribes a two step inquiry before judicial modification can take place. Initially, the court must determine that (i) the trust's purpose has become unlawful or (ii) the trust does not otherwise serve "any ... noncharitable purpose." 12 *Del. C.* § 3541(a). If so, then the court must evaluate whether the settlor contemplated the particular contingency and provided for it. *See* 12 *Del. C.* § 3541(b). The court only may modify or terminate a trust if the first inquiry is met and the trust instrument does not address the contingency. *Id.*; *see PNC Bank, Del.*, 2008 WL 2891150, at *7.

As with the other doctrines, the petition does not rely on judicial modification *per se*, but rather cites it as illustrative. As with the other doctrines, I see a different picture. By analogy to Section 3541, a court should not modify the Trust unless its purpose has become unlawful or it no longer serves "any ... noncharitable purpose." Neither is the case.

3.     **The Request For Modification Is Denied.**

The petition seeks to modify the Will in a manner that conflicts with Wallace's intent. Under Delaware law, the settlor's intent controls, and it is the public policy of this

---

remaining shall be distributed in accordance with the terms of the trust or, in the absence of such terms, as provided in § 3592 of this title.

12 *Del. C.* § 3556.

state "to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments." 12 *Del. C.* § 3303(a). The petitioners are not permitted to rewrite Wallace's Will to suit their current convenience.[12]

**B.      The Modification Of The Order**

The petition also seeks to modify the 2002 Order to impose a contingent choice-of-law scheme. Under the proposed provision, the law governing administration would flip back and forth between Delaware and New York depending on whether the application of Delaware law "will or might" have adverse consequences for the trust. In my view, the proposed language is too vague and uncertain to be implemented.

### III.      CONCLUSION

The relief sought in the petition is denied. Wallace's intent controls. The language of the 2002 Order continues to establish the law governing the Trust.

---

[12] The petition also confronts the obstacle that the terms of the Trust are set forth in the Will. This court has held that it lacks the equitable power to reform or modify a will. *See In re Last Will and Testament of Daland*, 2010 WL 716160 (Del. Ch. Feb. 15, 2010). Under *Daland*, the court cannot modify a testamentary trust, like the current Trust, where the provisions appear in a will. *See* Bogert, *supra*, § 991 at 133-34 ("[T]he traditional presumption against reforming mistakes in wills may present an additional challenge for a petitioner who seeks the reformation of a testamentary trust."). The petitioner argued that *Daland* should be limited to its facts and that the Court of Chancery should be able to reform both wills and testamentary trusts. In light of the disposition of the petition on the merits, this decision need not reach the issue.

29