IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTERS OF THE ESTATE AND )
TRUST OF JAMES KALIL, SR., deceased, )
and KALIL ASSOCIATES, a Delaware general )
partnership. )
)
DONALD J. KALIL, executor of the Estate of )
James Kalil Sr., and trustee of the James Kalil, )
Sr. Revocable Trust, and on behalf of Kalil )
Associates, a Delaware general partnership, )
)
    Petitioner, )
)
       v. )    C.A. No. 11047-MZ
)
JAMES P. KALIL, JANICE KETCHAM, )
LAURA BEDROSSIAN and JACQUELINE )
KALIL, )
)
    Respondents. )

MASTER'S REPORT
(Motions for Summary Judgment)

Date Submitted: October 29, 2017
Draft Report: November 3, 2017
Final Report: February 7, 2018

David J. Ferry, Jr., Esquire and Rick S. Miller, Esquire, of FERRY JOSEPH, P.A., Wilmington, Delaware; Attorneys for Petitioner.

James P. Kalil, pro se, Respondent.

Neil Lapinski, Esquire, of GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington Delaware; Attorneys for Janice Ketcham.

Thomas A. Uebler, Esquire, of COOCH & TAYLOR, P.A., Wilmington, Delaware; Attorneys for Jacqueline Kalil.

Laura Bedrossian Gibson, pro se, Respondent.

ZURN, Master

In this estate matter, the decedent had a comprehensive and oft-adjusted estate plan. However, the decedent did not title two primary assets, specifically an investment account and a property with an office building on it, in a manner that would permit their distribution according to the more recent features of his estate plan. One of the decedent's children, the executor of the decedent's estate, seeks to reform a trust so that the account is held in a more recently executed trust, and to dissolve a general partnership so that the property is held in a more recently created limited partnership. Another of the decedent's children objects and raises other claims regarding the estate.

In this final report on cross-motions for summary judgment, I conclude that the decedent's titling of the investment account cannot be addressed by trust reformation. I also conclude a general partnership holding title to the property should be dissolved and the property conveyed to a limited partnership that all believed had held the property for over a decade. I conclude that the objector's claims with regard to the decedent's estate and testamentary documents are time-barred. I recommend the Court grant the petitioner's motion for summary judgment in part and deny it in part, and deny the objector's motion for summary judgment. Finally, I recommend the Court permit some, but not all, of the petitioner's attorneys' fees to be paid from the decedent's trusts.

## I.    Background[1]

### A. The Parties and Entities

Dr. James Kalil, Sr. ("Settlor") died testate on November 8, 2014. He was survived by his children, petitioner Donald J. Kalil ("Petitioner") and respondents James Kalil, Jr. ("Respondent"), Laura Bedrossian Gibson ("Laura") and Janice Ketcham ("Janice").[2] Settlor was also survived by Respondent's daughter Jacqueline Kalil ("Jacqueline"). Settlor's wife Claire Kalil ("Claire") predeceased him.

Settlor created two revocable trusts: one in 1989, and one in 1997 ("the 1989 Trust" and "the 1997 Trust"). When Settlor died, the bulk of Settlor's liquid wealth was in an account titled in the name of the 1989 Trust. Petitioner is executor of Settlor's estate and trustee of Settlor's 1997 Trust, as amended.[3] Petitioner, Respondent, Janice, and Laura are co-trustees of the 1989 Trust.[4]

The Kalil family owned and ran an investment firm, now known as Affinity Wealth Management, Inc. ("AWM"), and formerly known as Compu-Val Investments, Inc. ("Compu-Val"). The firm has its principal place of business at 1702 Lovering Avenue, Wilmington, Delaware 19806 ("the Property"). Settlor

---

[1] The facts are drawn from the pleadings and the evidence submitted by the parties. *See* Ct. Ch. R. 56(c).
[2] Because many relevant parties share the same last name, I use first names in pursuit of clarity. I intend no disrespect.
[3] Pet'r Opening Br. App. Ex. [hereinafter Pet'r Ex.] 7A; Pet'r Ex. 5D.
[4] Pet'r Ex. 2, Art. XV.

and Claire created Kalil Associates, a Delaware general partnership, to acquire, hold, and manage the Property. Kalil Associates acquired the property on February 1, 1985.[5] Settlor and Claire were the sole partners of Kalil Associates. The record title of the Property is still held by Kalil Associates.

On May 10, 2000, Settlor and Claire formed Kalil Family Limited Partnership, a Delaware limited partnership ("Kalil LP").[6] Kalil LP was created to pass the Property's value to their children in a tax-efficient manner.[7] The Property was never transferred from Kalil Associates to Kalil LP.

### B. Settlor's Estate Plan

On February 23, 1989, Settlor executed the 1989 Trust along with a pourover will.[8] The 1989 Trust divides its property evenly among Settlor's four children.[9] Settlor reserved the powers of amendment and revocation.[10] On February 23, 1993, Settlor executed a Supplemental Trust Agreement, which amended the 1989 Trust to give one third of the trust property to Janice, one third to Laura, one sixth to Respondent, and one sixth to Petitioner.[11] The 1989 Trust

---

[5] At the same time, Kalil Associates also acquired an adjacent parcel known as 1701 Shallcross Avenue. The Shallcross Avenue property was subsequently subdivided and Kalil Associates retained a portion of that parcel as part of the Property. The Property is comprised of tax parcels numbered 2601320143 and 2601340138.

[6] Pet'r Ex. 7 (Aff. of Ernest D. Palmarella, Esq. [hereinafter "Palmarella Aff."]) ¶ 21.

[7] *Id.*

[8] Pet'r Ex. 2; Ex. 3 Item 5.

[9] Pet'r Ex. 2 ¶ I(B)(2)(b)(ii).

[10] *Id.* ¶ VIII.

[11] Pet'r Ex. 4 ¶ (C).

3

and 1993 Supplemental Trust Agreement state that the shares held by Petitioner and Respondent shall be funded with voting or equity interest in Compu-Val or its successor, and the other shares shall be funded with other assets.[12]

Also in 1993, Settlor opened an investment account with Butcher & Singer ("the Account") and titled the Account in the name of the 1989 Trust. In 2001, Settlor moved the Account to TD Bank, and in 2008, he moved it to Charles Schwab. The Account remained titled in the name of the 1989 Trust, and remains so titled today.

On July 15, 1997, Settlor executed the 1997 Trust.[13] Settlor also executed a new pourover will giving all the residue of his estate to the 1997 Trust.[14] The 1997 Trust originally distributed its property in the same proportion as the 1993 Supplemental Trust Agreement: one third to Janice, one third to Laura, one sixth to Respondent, and one sixth to Petitioner.[15] The 1997 Trust does not specify how those shares are to be funded. The 1997 Trust does not reference or explicitly revoke or amend the 1989 Trust.

---

[12] *Id.*; Pet'r Ex. 2 ¶ (B)(2)(b)(ii).
[13] Pet'r Ex. 7A.
[14] Pet'r Ex. 7B, Art. Fourth. Settlor also executed several codicils to his 1997 Will, the substance of which is not relevant here.
[15] Pet'r Ex. 7A ¶ 5(B).

Settlor amended the 1997 Trust six times before he passed on November 8, 2014.[16] The 1997 Trust as ultimately amended distributes one-sixth of its property to Respondent, debited by $500,000 for lifetime advancements, with the remainder held in trust for Respondent's lifetime. Respondent's distributions thereunder are limited to $120 per month while he is incarcerated, and thereafter to the interest on the trust principal for the balance of his life with the principal left in trust for Jacqueline. The 1997 Trust as amended distributes one third of its property to Janice, debited by $790,000 for lifetime advancements as well as any additional sums advanced for her benefit as determined by the Trustee. Finally, the 1997 Trust as amended distributes one third of its property to Laura and one sixth to Petitioner. In sum, the 1997 Trust's distribution scheme is more beneficial to

---

[16] On May 6, 2005, Settlor added Respondent as a co-trustee. Pet'r Ex. 7H. On August 7, 2007, Settlor placed the shares of Janice and Respondent in a continuing trust to be distributed to them over the course of their life expectancy. Pet'r Ex. 7I. The third amendment, dated March 5, 2010, revoked the two earlier amendments; deleted Respondent as a one-sixth beneficiary and replaced him with Jacqueline; debited Janice's one-third share by $500,000 to account for lifetime advancements; and debited Jacqueline's one-sixth (1/6) share by $300,000 to account for lifetime advancements to Respondent. Pet'r Ex. 7J. Settlor amended the 1997 Trust a fourth time on May 16, 2012. Pet'r Ex. 5A. Settlor revoked the three earlier amendments; restored Respondent as a one-sixth residual beneficiary; debited the respective residual shares of both Janice and Respondent by $500,000 to account for lifetime advancements; required those shares be held in trust for the course of beneficiaries' lives, but limited Respondent's distributions to $120 per month for so long as he remained incarcerated, and thereafter to interest only for the balance of his life with the remainder left in trust for Jacqueline; and named Claire and Petitioner as successor co-trustees. A fifth amendment, dated April 25, 2014, eliminated the requirement that Janice's residuary share be held in trust for her lifetime, but increased the amount that her share was to be debited to $790,000 plus any additional sums advanced for her benefit as determined by the Trustee. Pet'r Ex. 5C. A final amendment dated July 9, 2014, named Petitioner as sole successor trustee. Pet'r Ex. 5D.

Jacqueline, Petitioner, and Laura, while the 1989 Trust's distribution scheme is more beneficial to Respondent and Janice.

Pursuant to Settlor's 1997 will, Petitioner was appointed as personal representative of Settlor's estate on January 16, 2015. At the time of Settlor's death, the gross value of his property was approximately six million dollars. Settlor's largest assets are the Account, with an approximate date of death value of $4.3 million; a promissory note from Petitioner with an approximate balance of $1.4 million; and another promissory note from Kalil LP with an approximate balance of $36,331.00.

### C. Procedural History

On May 20, 2015, Petitioner, as executor of Settlor's estate and as trustee of the 1997 Trust, filed a petition naming his siblings and Jacqueline as respondents. Petitioner seeks to reform the 1997 Trust to replace, amend, or revoke the 1989 Trust, so that the Account titled under the 1989 Trust can be distributed according to the terms of the 1997 Trust, as Petitioner asserts Settlor intended. Petitioner also seeks to dissolve Kalil Associates, which holds the Property, and convey the Property to Kalil LP. Petitioner alleges Settlor and all other relevant parties and entities intended and believed Kalil LP held the Property.

On July 13, 2015, Janice answered the petition and asserted a counterclaim, to which Petitioner replied on July 28, 2015. On July 20, 2015, Jacqueline and

6

Petitioner stipulated to indefinitely extend Jacqueline's time to respond to the petition, and she has not responded. Laura consents to the relief sought.[17]

Respondent filed a *pro se*[18] motion seeking relief against the 1997 Trust and Settlor's estate on September 14, 2015. Respondent filed an answer to the petition on November 2, 2015. Respondent opposes reformation of the 1997 Trust. He also asserts two challenges against the 1997 Trust as amended and one claim against the 1989 Trust and 1993 Supplemental Trust Agreement. Finally, Respondent claims he received insufficient consideration when he sold his share in Kalil LP in 2010.

The parties engaged in discovery, and then in settlement discussions which proved unsuccessful. Respondent moved to amend his answer on October 31, 2016. Over Petitioner's objection, I recommended the Court grant Respondent's motion in a final report dated January 23, 2017.[19] The parties continued with discovery and prepared for trial.

Due to temporarily heightened prison security, Respondent was unable to participate in the February 28, 2017, pretrial conference and it seemed unlikely he would be able to attend the scheduled trial. I therefore granted the parties leave to

---

[17] Pet'r Ex. 1.

[18] Respondent is litigating from prison where he is serving a fourteen-year sentence. *See Kalil v. State*, 2014 WL 2568029, at *1-2 (Del. June 5, 2014).

[19] Exceptions to that report were stayed pending final adjudication of this matter on the merits. Any exceptions to that report should be filed within the exceptions period for this final report.

file motions for summary judgment and continued the trial. Petitioner filed his motion on March 28, 2017, and his opening brief on April 14, 2017. Respondent filed his response and request for summary judgment on May 2, 2017. Petitioner replied on May 22, 2017. On June 1, 2017, Respondent indicated he had received that reply and stood on his earlier submission. Respondent supplemented his submissions on July 31, 2017.

On August 14, 2017, I asked for supplemental briefing. Petitioner filed a supplemental brief on August 29, 2017, and Respondent filed a letter in opposition on September 12, 2017. Janice filed a letter taking no position. I took the matter under advisement on the briefs. I issued a draft report on November 3, 2017, and extended the time for filing a notice of exceptions to twenty days due to Respondent's reliance on the prison mail system.

Petitioner filed a notice of exceptions on November 22, 2017, and "Respondent's response to Master's Report" dated November 21, 2017 was docketed November 28, 2017. Respondent supplemented his response via a letter dated November 25, 2017, which was docketed on November 29. Petitioner filed his opening brief on December 13, 2017, together with a motion for enlargement of time to file the opening brief, which I granted. On January 19, 2018, Petitioner wrote to express his view that his exceptions were ripe for review and to ask that Respondent's exceptions be dismissed as untimely.

8

This is my final report on the parties' cross-motions for summary judgment. Exceptions that improved the final report are incorporated herein. Exceptions that are dismissed are addressed in footnotes.

## II.    Analysis

Petitioner contends that Settlor intended the Account to be distributed according to the terms of the 1997 Trust as amended, but mistakenly failed to retitle the Account under the 1997 Trust. The Account was Settlor's most significant asset at the time of his death; the only other significant assets were two promissory notes. Without judicial intervention, the Account would be distributed according to the 1989 Trust as amended by the 1993 Supplemental Trust Agreement, and not according to Settlor's 1997 pourover will and the 1997 Trust as amended. Petitioner asserts Settlor erred because he intended to distribute the Account pursuant to the terms of the 1997 Trust as amended.

To remedy Settlor's mistake, Petitioner seeks relief from among a hierarchy of choices. Petitioner's preferred remedy is a declaration that the 1997 Trust meets the 1989 Trust's criteria for exercising the power to amend, and acts as an amendment to the 1989 Trust such that it is effectively subsumed into the 1989 Trust. In the alternative, Petitioner seeks reformation of the 1997 Trust so that it amends the 1989 Trust. And as least preferred alternatives, Petitioner seeks a declaration that the 1997 Trust revoked the 1989 Trust, or reformation of the 1997

9

Trust so that it revokes the 1989 Trust. Petitioner also seeks dissolution of Kalil Associates to permit transfer of the Property to Kalil LP, as Petitioner contends Settlor intended.

Respondent opposes Petitioner's request to cause the 1997 Trust to be subsumed by, to amend, or to revoke the 1989 Trust. Respondent claims the 1997 Trust is invalid and was created under undue influence by Petitioner, and takes issue with certain of the deductions to his share made in 1997 Trust amendments and in the 1993 Supplemental Trust Agreement. As for the partnership issue, Respondent challenges the terms of the transaction in which he sold his interest in Kalil LP, and claims the Property should be governed by the 1989 Trust.

"The function of summary judgment is the avoidance of a useless trial where there is no genuine issue as to any material fact."[20] Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[21] "A fact is material if it might affect the outcome of the suit under the governing law."[22] A material issue of fact exists if "a rational trier of

---

[20] *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997).
[21] Ct. Ch. R. 56(c).
[22] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

fact could find any material fact that would favor the non-moving party in a determinative way."[23]

The movant bears the initial burden of demonstrating that there is no question of material fact.[24] When the movant carries that burden, the burden shifts to the nonmoving party "to present some specific, admissible evidence that there is a genuine issue of fact for trial."[25] The court must view the evidence most favorably to the non-moving party.[26] Even so, the non-moving party may not rely on allegations or denials in the pleadings to create a material factual dispute.[27]

### A. Settlor did not intend the 1997 Trust to amend or revoke the 1989 Trust, so the 1997 Trust cannot be deemed to have done so.

Petitioner first argues that the 1997 Trust should be considered or deemed an amendment and restatement of the 1989 Trust. Petitioner contends that deeming the 1997 Trust to be an amendment of the 1989 Trust creates "one continuous trust" that permits the Account to pass out of probate pursuant to the terms of the 1997 Trust as amended.[28] As a less preferable alternative, Petitioner argues the 1997 Trust should be deemed to have revoked the 1989 Trust.[29] Petitioner

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Ct. Ch. R. 56(e); *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000).

[27] *Fike*, 754 A.2d at 260.

[28] Pet'r Supp. Br. at 5. I make no determination as to whether this would be the case.

[29] In my draft report, I declined to substantively address revocation of the 1989 Trust because revocation would expose the Account to probate fees, contrary to Settlor's intent. *See* Pet'r

11

contends that the 1997 Trust can be deemed an amendment or revocation without any reformation of the 1997 Trust.

Petitioner asserts the 1997 Trust satisfies the 1989 Trust's requirements for amendment and revocation. The 1989 Trust states:

> Settlor reserves to himself the right, at any time and from time to time, by instrument in writing, lodged with Trustee during Settlor's lifetime, to amend or revoke this Agreement, in whole or in part.[30]

Petitioner contends the 1997 Trust is an "instrument in writing" that was "lodged with" Settlor, who was Trustee of the 1989 Trust at the time the 1997 Trust was executed. Under Petitioner's theory, the 1989 Trust's broad language allows any "instrument in writing" in Settlor's possession to amend or revoke the 1989 Trust, regardless of whether such instrument expresses an intention to amend, because expression of that intention was not required by the terms of the 1989 Trust. Petitioner concludes that because Settlor intended the 1997 Trust and its

---

Supp. Br. at 4-5 ("This result was clearly not intended by Dr. Kalil who used the revocable trust format as a means of avoiding probate fees."); *In re Peierls Family Inter Vivos Trusts*, 77 A.3d 249, 263 (Del. 2013) (providing the "seminal rule" of trust construction is that the settlor's intent controls). On exception, Petitioner clarified his position that Settlor's "primary intent … was to distribute his estate under the terms of the 1997 Trust," and that this intent trumps Settlor's secondary intent to keep his estate out of probate. Br. on Exceptions at 11-13. Petitioner asserts Settlor "would have taken the distributive scheme of the 1997 Trust over the avoidance of probate." *Id.* at 13. Because I conclude the 1997 Trust did not exercise the 1989 Trust's power to amend or revoke, I need not distinguish between amendment and revocation. I note in passing the absence of any evidence of Settlor's alleged nuanced intent to distribute the Account pursuant to the 1997 Trust, even at the cost of paying probate fees, rather than distribute the Account pursuant to the 1989 Trust.

[30] Pet'r App'x Ex. 2, ¶ VIII(A).

amendments to control the Account's disposition, the 1997 Trust should be deemed to have exercised Settlor's power to amend or revoke the 1989 Trust.

"The settlor of an inter vivos trust has power to revoke or modify the trust to the extent the terms of the trust … so provide."[31] If the trust reserves to the settlor a power to revoke or amend the trust exclusively by a particular procedure, "the settlor can exercise the power only by substantial compliance with the method prescribed."[32] The law requires a settlor to express an intent to revoke, though that expression need not be in formal terms.[33] Intent to revoke or amend can be expressed implicitly, such as by referring to the property that is the subject to the power to revoke or amend, or where the instrument at issue would be meaningless unless it exercised the power to revoke or amend.[34] "Any power that a settlor has to amend a trust dies with him or her."[35]

---

[31] Restatement (Third) of Trusts § 63(1) (2003).

[32] *Id.* cmt. i; Ronald Chester, George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees [hereinafter "Bogert"] § 993 (3rd ed. 2005) ("If the method of exercising the power of modification is described in the trust instrument, such a provision will control … ."); *Security Trust Co. v. Spruance*, 174 A. 285, 288 (Del. Ch. 1934). Petitioner relies on an excerpt from the Restatement's preceding comment, comment h, which addresses the "[f]orm of exercise when no method is specified." Because the 1989 Trust specified an exclusive method of revocation and amendment, Petitioner's cited comment is inapplicable.

[33] *Spruance*, 174 A. at 288.

[34] *Id.* ("If there is a reference to the property which is the subject of the power, or where the instrument which is questioned as an exercise of the power would be a nullity unless it were as claimed, it is settled that the power is as effectively exercised as though a purpose to exercise it had been affirmatively disclosed.")

[35] 76 Am. Jur. 2d Trusts § 69.

13

Whether the 1997 Trust amended, revoked, or is subsumed within the 1989 Trust is guided by Settlor's intent and whether he expressed any intent to amend or revoke at the time he executed the 1997 Trust. This is a different, and narrower, intent than the intent for the 1997 Trust to govern distribution of the Account. It is undisputed that the 1997 Trust does not formally express any intent to amend or revoke.

Nor does it express any such intent by reference to the 1989 Trust's property.[36] To the contrary, the 1997 Trust explicitly holds different property than the 1989 Trust. The 1989 Trust identifies its property as "the property set forth in Schedule A." Schedule A lists shares of Compu-Val, a 50% interest in Kalil Associates, and a life insurance policy.[37] The 1993 Supplemental Trust Agreement defines the res of the 1989 Trust as the property held at the time Settlor executed the 1989 Trust "together with all other property transferred to Trustee since that time, and which may be transferred to Trustee in the future from time to time."[38] The 1997 Trust identifies as trust property a $1.00 bill, and empowers Settlor or

---

[36] *See Spruance*, 174 A. at 288.

[37] Pet'r Ex. 2, Preamble, Sched. A. On exception, Petitioner points out that Kalil Associates became defunct, and states that the shares of Compu-Val were "eventually sold to the petitioner outside of any trust." Br. on Exceptions at 4-5. But Kalil LP did not take over Kalil Associates' duties until on or around 2000. *See infra*, notes 75, 76, 96, and accompanying text. When Settlor executed the 1997 Trust, the 1989 Trust still held Compu-Val shares and an interest in Kalil Associates as valuable property, and the 1997 Trust did not refer to that property. This exception is dismissed.

[38] Pet'r Ex. 4, ¶ A.

any other person to add property to the trust res with Settlor's consent.[39] The 1997 pourover will places the residue of Settlor's estate in the 1997 Trust.[40] The 1997 Trust does not express any intent to amend by referring to the 1989 Trust's separate property.

Finally, the 1997 Trust does not express an intent to amend or revoke the 1989 Trust by being meaningless unless it does so.[41] The 1997 Trust holds the residue of Settlor's estate, estimated at $1.5 million.[42] While that may not fund shares for each beneficiary once the enumerated deductions are taken, the Trust has a corpus and is not a nullity.

In fact, the evidence supports the conclusion that Settlor did not intend the 1997 Trust to be an amendment or revocation of the 1989 Trust when he executed it. Settlor created the 1997 Trust as a standalone trust. Settlor executed the 1997 Trust only four years after signing the 1993 Supplemental Trust Agreement, which demonstrates his awareness of the 1989 Trust and an effective means of amending it. Settlor again demonstrated his knowledge of a way to clearly express his intent to amend a trust beginning in 2005, when he made his first of many amendments to

---

[39] Pet'r Ex. 7A, ¶¶ 1-2, Sched. A.
[40] Pet'r Ex. 7B, Art. Fourth.
[41] *See Spruance*, 174 A. at 288 ("If there is a reference to the property which is the subject of the power, or where the instrument which is questioned as an exercise of the power would be a nullity unless it were as claimed, it is settled that the power is as effectively exercised as though a purpose to exercise it had been affirmatively disclosed.").
[42] Pet'r Ex. 5, Aff. of Daniel R. Losco, Esq. [hereinafter "Losco Aff."] Ex. E.

the 1997 Trust.[43]  Assuming *arguendo* that the 1997 Trust is an "instrument in writing" "lodged with Trustee during Settlor's lifetime," at the time Settlor lodged it he did not intend it to amend or revoke the 1989 Trust.

By contrast, the successive trusts at issue in *Security Trust Co. v. Spruance*, cited by Petitioner,[44] expressed an intent to revoke and addressed the same property, and the later trust would be a nullity if not reformed.  In *Spruance*, the settlor executed three trusts:  a first revocable trust in 1923, instructing a trustee to hold and distribute certain insurance policies; a second trust in 1926, which explicitly revoked the 1923 trust and instructed the trustee to distribute those same policies in a different manner; and a third trust in 1931, which explicitly revoked the 1923 trust (not the 1926 trust) and again changed the manner of disposition of the same policies.  The Court concluded that the settlor intended the 1931 trust to

---

[43] *See supra*, note 16.

[44] 174 A. 285 (Del. Ch. 1934).  On exception, Petitioner noted that my draft report did not analyze two cases from other jurisdictions that Petitioner cited.  *See Estate of Davis*, 775 A.2d 1127 (Me. 2001); *Rosenblum v. Gibbons*, 685 S.W.2d 924 (Mo. App. 1984).  These cases, "of course, are not binding on this Court."  *Tolou v. Anderson*, 1994 WL 374311, at *2 (Del. Ch. June 20, 1994).  They are also distinguishable.  Both *Davis* and *Rosenblum* addressed a series of trusts like that in *Spruance* and unlike the one at issue here:  successive trusts that held the same corpus but directed different dispositions, and that therefore could not stand independently.  *See Davis*, 775 A.2d at 1129, 1132 (noting the two trusts both held shares of the testator's company and had identical language with the exception of distribution provisions); *Rosenblum*, 685 S.W.2d at 930 ("Except for differences in the dispositive provisions, the two instruments are virtually identical.  … [M]ost importantly, the corpus is the same.  … The utter impossibility of applying different dispositive provisions to a single corpus compels the conclusion that the grantor's intent was the later instrument replace and supplant the former, even though revocation of the former is not specifically expressed.").  This case does not present the same impossibility, and therefore does not warrant the same conclusion.

revoke the 1926 trust because it expressed an intent to revoke and because both trusts expressly dealt with the identical res or corpus identified in the earlier trust.[45] The Court reasoned, "If the earlier one stands, the later one must fall. They are irreconcilable."[46]

This case is distinguishable for several reasons. First, the *Spruance* trust contained specific (but flawed) revocation language, whereas Settlor's 1997 Trust contains no language of amendment or revocation. Second, Settlor's two Trusts hold different property and can coexist and function in parallel without conflict. The 1997 Trust did not implicitly or expressly show the intent to amend or revoke the 1989 Trust, as was the case in *Spruance*. To the contrary, as explained above, the circumstances surrounding the execution of the 1997 Trust indicates Settlor intentionally used language creating a standalone trust instead of language of amendment or revocation.

The 1997 Trust was created by Settlor as an independent second trust, and is not an amendment to the 1989 Trust. It may be that Settlor intended the 1997 Trust to guide distribution of the Account. But the evidence supports the conclusion that Settlor also intended the 1997 Trust to be an independent, standalone trust when he executed it. I conclude this intent may not be violated or

---

[45] *Id.* at 287-88.
[46] *Id.* at 288.

displaced to fix deficiencies in other aspects of Settlor's portfolio management.  I

recommend the Court deny Petitioner's request for a summary judgment declaring

the 1997 Trust to have exercised the 1989 Trust's reserved power to amend or

revoke.

## B. Reformation may not remedy Settlor's mistake in failing to retitle the Account because that mistake did not affect specific terms in the 1997 Trust.

As an alternative to deeming the 1997 Trust to be an amendment to or

revocation of the 1989 Trust, Petitioner asks the Court to reform the 1997 Trust to

include language of amendment or revocation of the 1989 Trust, based on

unilateral mistake by Settlor.  I conclude that Settlor's mistake was in titling the

Account, and that because that mistake did not affect the expression, inclusion or

omission of specific terms in the 1997 Trust – but rather, affects only the title of

the Account – reformation is not appropriate.[47]

Generally, courts cannot consider extrinsic evidence relating to the meaning

of specific terms in a written trust to interpret those terms.[48]  Where a provision of

the trust agreement is clear and unambiguous, the court will not consider extrinsic

---

[47] Because reformation is not appropriate to fix Settlor's mistake in mistitling the Account, regardless of whether that reformation adds language of amendment or revocation, this final report does not distinguish between amendment and revocation.  *See supra*, note 29.
[48] *Otto v. Gore*, 45 A.3d 120, 131 (Del. 2012) (en banc); *Benz v. Wilmington Trust Co.*, 333 A.2d 169, 170 (Del. 1975); *DiSabatino v. Diferdinando*, 2002 WL 2005743, at *2 (Del. Ch. Aug. 13, 2002).

18

evidence to vary or contradict the ordinary meaning of the provision.[49] This rule is particularly significant in the context of testamentary documents, where the author is deceased and cannot provide further insight into his intention.[50] Even in the context of a mistake, this Court has refrained from reforming an otherwise proper and unambiguous will.[51]

But a trust may be rescinded or reformed upon the same grounds as those upon which a transfer of property not in trust may be rescinded or reformed, including mistake.[52] Because a settlor usually receives no consideration for the creation of a trust, a settlor's unilateral mistake may warrant trust reformation.[53] The mistake must be proven by clear and convincing evidence.[54] This high burden

---

[49] *Otto*, 45 A.3d at 136.

[50] *Miller v. Equitable Trust Co.*, 32 A.2d 431, 434 (Del. 1943) ("A person's will, to him at least, is in the category of a sacred instrument. It speaks after death the wish, the desire, the intent of the deceased. If the intent therein be clearly expressed, it will not be disturbed, and the testator's discretion as evidenced by his intention will be upheld.").

[51] *Id.* at 435-36 ("If a mistake was made in the writing of the codicil in this case, it is, to say the least, unfortunate … . However, this court has no power to correct a mistake, and it cannot, by the introduction of parol evidence, rewrite the codicil."); *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476, 482 (Del. 1945) ("Subsequent events or circumstances not clearly shown to have been definitely anticipated by the testator, and happening after the execution of a will, can form no part in the intent of that will, or enter into the construction of its terms."); *In re Last Will and Testament of Daland*, 2010 WL 716160, at *5 (Del. Ch. Feb. 15, 2010) (where a will was properly executed, finding "it is not within the court's power to insert additional language in the will to correct an alleged mistake of omission"); *see In re Trust Under Will of Flint for the Benefit of Shadek* [hereinafter *Flint*], 118 A.3d 182, 198 n.12 (Del. Ch. 2015).

[52] *Flint*, 118 A.3d at 195 (citing Restatement (Third) of Trusts § 62).

[53] *Id.*; *Roos v. Roos*, 203 A.2d 140, 142 (Del. Ch. 1964).

[54] *Flint*, 118 A.3d at 195; *Roos*, 203 A.2d at 142.

of proof is appropriate because the party seeking reformation is seeking to establish that a donative document does not reflect the donor's intention.[55]

Reformation requires the petitioner to establish by clear and convincing evidence:  (1) that a mistake of fact or law, whether in expression or inducement, affected the specific terms of the document; and (2) the settlor's intention.[56]  A mistake in expression occurs when the writing does not express the settlor's intent, as is often seen in a scrivener's error.[57]  A mistake in the inducement arises when a trust includes a term that was intended to be included, or fails to include a term that was not intended to be included, but the intention regarding the term was the product of a mistake of fact or law.[58]  Extrinsic evidence must establish, by clear and convincing evidence and with particularity, that a mistake "affected the expression, inclusion, or omission of specific terms in the document."[59]

I assume for the sake of this analysis that Settlor intended to distribute the Account according to the 1997 Trust.  If that is assumed, I must conclude that Settlor made a mistake.  But Settlor's mistake was not a mistake in expression in the language of the 1997 Trust.  Settlor made a mistake in failing to retitle the

---

[55] Restatement (Third) of Prop.: Wills & Donative Transfers [hereinafter "Property Restatement"] § 12.1 cmt. e (2003); *see* Bogert, *supra*, § 991 at 133-34 ("[T]he traditional presumption against reforming mistakes in wills may present an additional challenge for a petitioner who seeks the reformation of a testamentary trust.").

[56] Restatement (Third) of Trusts § 62 (2003).

[57] Property Restatement, *supra*, § 12.1 cmt. i; Bogert, *supra*, § 991 at 132-33.

[58] Property Restatement, *supra*, § 12.1 cmt. i; Bogert, *supra*, § 991 at 132.

[59] Property Restatement, *supra*, § 12.1 cmts. g, j.

Account in the name of the 1997 Trust.[60]  That act is wholly separate from the

terms of the 1997 and 1989 Trusts.  Had Settlor simply retitled the Account, his

trusts would express his intention.  There is no error in the language of the 1997

Trust; the error was in Settlor's failure to retitle the Account.[61]

Settlor's estate planning attorneys also source Settlor's mistake in the

Account's titling rather than the Trust's terms.  The attorney who prepared the

1997 Trust affirmed:

> Had I been aware that the investment account was titled in the name
> of the 1989 trust I would have certainly counseled Dr. Kalil to re-title
> it in the name of the 1997 trust since that was the vehicle that Dr.
> Kalil intended to use to transfer his wealth.[62]

And Settlor's subsequent estate planning attorney who prepared several

amendments to the 1997 Trust affirmed similarly:

---

[60] Pet'r Supp. Br. at 5.

[61] On exception, Petitioner asserts it was erroneous to confine Settlor's mistake to the Account title.  Petitioner argues that doing so disregards Settlor's "unquestionable belief that the 1997 Trust had legally taken the place of the 1989 Trust" and that "it is completely reasonable to *assume* that [Settlor] did not change the ownership of the … Account because he believed the 1997 Trust already had legally supplanted the 1989 Trust."  Br. on Exceptions at 14 (emphasis added).  Petitioner reasons that Settlor set up and titled the Account, and received statements indicating its title, but still believed the 1997 Trust controlled the Account since its assets are necessary to fund its distribution scheme.  Petitioner concludes, "It is logical then to *assume* that [Settlor] was mistaken as to the legal effect of the 1997 Trust vis a vis the 1989 Trust."  *Id.* at 14-15 (emphasis added).

   Reformation may not be based on assumptions.  It must be based on clear and convincing evidence that establishes with particularity that a mistake affected the expression, inclusion, or omission of specific terms in the document.  Property Restatement, *supra*, § 12.1 cmts. g, j.  Petitioner's circular argument as to why Settlor did not fix his mistake does not change the fact that the 1997 Trust's distributive scheme is frustrated by Settlor's failure to retitle the Account, not by any mistake in the 1997 Trust's language.  Petitioner's exception is dismissed.

[62] Palmarella Aff. ¶ 11.

> Had I known that the investment account was titled in the name of the 1989 trust I would have advised Dr. Kalil to change the title of the account to the 1997 trust to make sure his estate plan was properly funded and implemented.[63]

If Settlor's attorneys had known about the titling of the Account, they would have remedied that error by retitling the Account, not by redrafting the 1997 Trust to be an amendment of the 1989 Trust. There was no scrivener's error — the Trusts' language expresses the Settlor's intent. Settlor's failure to retitle the Account is not a mistake in expression for which reformation is available.

Whether Settlor's failure to retitle the Account is a mistake in inducement is a closer call. Assuming that Settlor intended to distribute the Account according to the 1997 Trust, it would follow that Settlor was mistaken in believing the Account was titled to permit such distribution at the time Settlor executed the 1997 Trust. But Petitioner has failed to meet his burden of proving by clear and convincing evidence, and with particularity, that the titling mistake affected the expression, inclusion, or omission of specific terms in the 1997 Trust.[64] There is no evidence that Settlor's mistake of fact regarding the Account's title caused the 1997 Trust to include or omit any specific term. To the contrary, the evidence (in the form of Settlor's attorneys' affidavits) indicates the only product of the mistake was the Account's title.

---

[63] Losco Aff. ¶¶ 7, 8.

[64] *See* Property Restatement, *supra*, § 12.1 cmts. i, g, j; Bogert, *supra*, § 991 at 132.

22

Petitioner suggests that Settlor's mistake can be fixed by adding a term to the 1997 Trust to make it an amendment of the 1989 Trust. As a practical matter, this may be true. But Petitioner puts the cart before the horse. The inquiry is not whether changing trust language can fix a mistake: it is whether the mistake affected specific trust language at the time that language was drafted. The law requires clear and convincing evidence that the absence of specific amendment language in the 1997 Trust is a product of Settlor's mistake.[65] Petitioner fails to prove the requisite causation. To the contrary, the evidence suggests that if Settlor or his attorneys had recognized his mistake, he would not have added the amendment language Petitioner suggests, but instead would have retitled the Account. Because Settlor's titling mistake did not affect specific terms in the 1997 Trust, reformation is not an available remedy.

I contrast Settlor's mistake with the illustrated mistakes in inducement in the Property Restatement, *supra*.

> 7. G created an inter vivos trust. The trust document did not contain a clause reserving to G a power to revoke the trust. Controlling law provides that a trust is irrevocable in the absence of an expressly retained power to revoke. After G signed the document, G's financial condition changed and G sought to revoke the trust.
>
> Extrinsic evidence shows that G intended to create a revocable trust and did not understand the need for a revocation clause.

---

[65] *See supra*, notes 56-59.

If this evidence satisfies the clear-and-convincing-evidence standard of proof, the trust document is reformed to insert a power to revoke.

8. G created an inter vivos trust of the bulk of his assets. The trust document did not contain a clause reserving to G a power to revoke the trust. Controlling law provides that a trust is irrevocable in the absence of an expressly retained power to revoke. After G signed the document, G sought to revoke the trust.

Extrinsic evidence shows that G established the trust when he was in line for a high-level position in the federal government. From the press reports he had read, he mistakenly believed that he had to place all of his assets into an irrevocable trust in order to comply with federal policies on public-service conflicts of interest. G liquidated much of his property, and placed the bulk of his assets into the irrevocable trust. Subsequently, G learned that federal policies did not require him to transfer his assets to an irrevocable trust.

If this evidence satisfies the clear-and-convincing-evidence standard of proof, the trust document is reformed to insert a power to revoke.[66]

In each of these illustrations, the absence of the power to revoke was the specific product of the settlor's mistake. In Illustration 7, the settlor thought he had created a revocable trust even without a term reserving the power to revoke. In Illustration 8, the settlor thought he had to create an irrevocable trust when he did not. In each illustration, the settlor did not include a term granting a power to revoke because he did not intend to include such a term, but that intention was the product of the settlor's mistake.

---

[66] Property Restatement, *supra*, § 12.1 cmt. i.

By contrast, Settlor's intention for the 1997 Trust to be a standalone trust instead of an amendment to the 1989 Trust was not the product of his mistake in titling the Account.[67] Settlor's mistake in titling the Account caused erroneous language in the Account's title, not in the 1997 Trust. There is no evidence that Settlor's mistake caused the absence of revocation or amendment language in the 1997 Trust. The Third Restatement of Property does not support reforming the 1997 Trust.

Petitioner also relies on *Roos v. Roos*.[68] In *Roos*, a trust with language that clearly did not conform to the settlor's stated intent was reformed. The preamble of the subject trust stated the settlor intended "to create a trust fund for myself and my wife for our respective lives and for our children upon our decease."[69] But the clause directing income payments to the settlor's children only directed those payments if the settlor's wife predeceased the settlor.[70] If the settlor died first –

---

[67] On exception, Petitioner claims this case resembles Illustration 7, arguing that Settlor believed the 1997 Trust had supplanted the 1989 Trust and "must have assumed the 1997 Trust contained the words necessary to have that legal effect." Br. on Exceptions at 15. Petitioner's daisy chain of assumptions fails to support reformation. First, as explained in Section A, *supra*, there is no basis to conclude that Settlor intended the 1997 Trust to supplant the 1989 Trust. And second, there is no evidence that Settlor believed or "assumed" the 1997 Trust contained language necessary to do so. There is evidence showing that Settlor believed the 1997 Trust would govern distribution of the Account, but not that Settlor thought this would be accomplished by language relating the 1997 Trust to the 1989 Trust. By contrast, Illustration 7 specifies clear and convincing evidence showing the settlor intended to create a revocable trust, and the particular disconnect between the settlor's intent and specific trust terms. Petitioner's exception regarding the applicability of Illustration 7 is dismissed.

[68] 203 A.2d 140 (Del. Ch. 1964).

[69] *Id.* at 141.

[70] *Id.*

which he did – the trust did not specify his intention as to the income upon his wife's death, and made no provision for the settlor's children as the preamble stated the settlor intended. Thus, the trustees were faced with an internally inconsistent trust and circumstances under which trust terms would not permit the trustee to carry out the settlor's explicitly stated intent.

Reformation was warranted in *Roos* because the settlor made a mistake that was clearly and specifically linked to specific trust language. Here, Settlor's mistake does not affect trust language. Neither the Trusts themselves, nor the extrinsic evidence, indicate any mistake that is clearly and specifically linked to specific trust language. *Roos* does not compel reformation of the 1997 Trust.

In conclusion, I recommend the Court deny Petitioner's request to reform the 1997 Trust to compensate for Settlor's mistake in titling the Account. The evidence that Settlor intended for the Account to be distributed according to the 1997 Trust as amended is compelling. Settlor's estate planning attorneys affirmed Settlor intended the 1997 Trust to be the primary vehicle for handling his estate, and neither attorney knew about the 1989 Trust or the titling of the Account.[71] Settlor's many amendments to the 1997 Trust, including sizeable deductions from beneficiaries' shares, indicate he believed the 1997 Trust would be funded in

---

[71] Losco Aff. ¶¶ 7, 8, 12; Palmarella Aff. ¶¶ 9, 10, 11.

excess of those deductions, requiring funds from the Account.[72] But Settlor's mistake in titling the Account did not cause the omission or inclusion of any specific language in the 1997 Trust. His unilateral mistake affected language in the Account's title, not the 1997 Trust. The high and specific evidentiary burden for reforming a deceased settlor's donative instrument has not been met. I recommend the Court deny Petitioner's motion for summary judgment on Petitioner's Count I for reformation.

**C. Judicial dissolution of Kalil Associates is equitable and appropriate.**

Settlor formed two entities to hold the Property. The first, Kalil Associates, was formed on November 29, 1984, pursuant to the Uniform Partnership Act of the State of Delaware, to own, hold, and manage the Property.[73] The Property was deeded to Kalil Associates on February 1, 1985. The Property was Kalil Associates' only asset. Settlor transferred his economic interest in Kalil Associates to the 1989 Trust, and Claire transferred hers to her own trust executed in 1989.[74]

In 2000, Ernest D. Palmarella, Esquire, created Kalil LP as an "integral part" of Settlor and Claire's estate plan.[75] Settlor and Claire intended to use Kalil LP to

---

[72] Losco Aff. ¶ 13; Palmarella Aff. ¶ 19. On exception, Petitioner argues that accepting the premise that Settlor intended the 1997 Trust to control the Account requires accepting the premise that Settlor was "mistaken as to the legal effect of the 1997 Trust in relation to the 1989 Trust." Br. on Exceptions at 17. I reject the latter premise. Settlor was mistaken as to the legal effect of the 1997 Trust in relation to the Account, not the 1989 Trust.

[73] Pet'r Ex. 6 Preamble, ¶¶ 1, 3.

[74] Pet. ¶ 41; Pet'r Ex. 2 Sched. A.

[75] Palmarella Aff. ¶ 21.

pass the Property to their children in a tax-efficient manner.[76]  When forming Kalil LP, Palmarella told Settlor, "The property located at 1702 [Lovering Avenue] will be transferred to [Kalil LP]."[77]  Palmarella also created an option agreement for Kalil LP, granting Petitioner the option to purchase the Property upon the deaths of Settlor and Claire, which represented that Kalil LP owned the Property.[78] Palmarella affirmed, "It was always my belief in dealing with Kalil, LP that the [P]roperty had in fact been deeded to the LP.  It was only after Dr. Kalil's death that I learned that he never actually took the step of executing and recording a deed from the general partnership to Kalil LP."[79]

As originally established, Settlor and Claire maintained a 95% limited partnership interest in Kalil LP, and each of their four children received a 1% limited partnership interest.[80]  In 2006, Settlor and Claire transferred their interests in Kalil LP to their children, such that Petitioner, Respondent, Janice, and Laura each owned an equal share in Kalil LP.[81]

Settlor, Claire, and their children proceeded from the point of Kalil LP's creation as if Kalil LP owned the Property.  Kalil LP rented the Property to

---

[76] *Id.*
[77] Pet'r Ex. 7L; *accord*, Palmarella Aff. ¶ 22.
[78] *Id.* ¶ 23; Pet'r Ex. 7M.
[79] Palmarella Aff. ¶ 23.
[80] *Id.* ¶ 23.
[81] *Id.* ¶ 24.

Compu-Val, generating an income stream.[82]  Kalil LP reported that rent as income to taxing authorities, representing that Kalil LP owned the Property.[83]  Each partner signed the option agreement stating Kalil LP owned the Property.[84]  In 2010, Kalil LP bought out Respondent's interest in Kalil LP, financed by a loan from Settlor.[85]  Respondent's interest in Kalil LP was priced according to the value of Kalil LP's asset:  the Property.[86]

Petitioner requests that the Court enter a decree of dissolution for Kalil Associates, and direct Petitioner, as executor of the estate of Kalil Associates' surviving general partner, to execute and record a deed for the Property to Kalil LP.  Petitioner cites only the maxim that "[e]quity regards that as done which in good conscience ought to be done" as legal support for this remedy.[87]  Respondent asserts that since Kalil Associates was never dissolved, Kalil Associates still owns the Property, and the Property should be allocated among the Settlor's children according to the 1989 Trust.[88]

Delaware general partnerships are governed by their partnership agreements, except in limited circumstances not applicable here.[89]  To the extent the partnership

---

[82] *Id.* ¶ 21; Losco Aff. ¶ 14.
[83] Palmarella Aff. ¶¶ 21, 25; Losco Aff. ¶ 14.
[84] Pet'r Ex. 7M.
[85] Palmarella Aff. ¶¶ 26-27; Pet'r Ex. 7O.
[86] Palmarella Aff. ¶ 26.  The Property was valued at $1 million.  *Id.*
[87] Pet'r Op. Br. at 27 (quoting *Thompson v. Lynch*, 990 A.2d 432, 435 (Del. 2010)).
[88] Resp't Ans. ¶ 27.
[89] 6 *Del. C.* § 15-103(a).

agreement does not otherwise provide, the Delaware Revised Uniform Partnership Act governs relations among the partners and between the partners and the partnership.[90]  Kalil Associates' partnership agreement states that the partnership "shall be dissolved only by (i) The disposition of all properties and assets of the partnership; (ii) The vote of the partners owning a majority of the capital accounts of the partnership."[91]  The problem presented is that Kalil Associates has not actually disposed of its properties and assets, namely the Property.  Further, Kalil Associates' partnership agreement specifies that death of a partner does not dissolve the partnership.[92]

Judicial dissolution of a general partnership is governed by 6 *Del. C.* § 15-801, which states a partnership is dissolved on application by a transferee of a partner's economic interest to the Court of Chancery, upon a determination by the Court of Chancery that it is "equitable to wind up the partnership business or affairs … [a]fter the … completion of the undertaking, if the partnership was for a … particular undertaking at the time of the transfer."[93]  Pursuant to Section 15-103(b)(6), a partnership agreement may not vary this standard for dissolution.

---

[90] *Id.*; 12 *Del. C.* § 15-1206(b) ("On and after January 1, 2002, this chapter governs all partnerships."); *Total Holdings USA, Inc. v. Curran Composits, Inc.*, 999 A.2d 873, 877-79 (Del. Ch. Oct. 9, 2009).  Kalil Associates did not elect to be governed by the preceding version of the Uniform Partnership Act.
[91] Pet'r Ex. 6 ¶ 17(a).
[92] *Id.* ¶ 15(a).
[93] 6 *Del. C.* § 15-801(6)(i).

I conclude judicial dissolution is appropriate under Section 15-801(6). Petitioner, as executor of Settlor's estate, is a transferee entitled to request judicial dissolution.[94] Kalil Associates existed for the following undertakings:

(a) To buy, own, build upon (or contract to be built upon), alter, mortgage, repair, operate, manage, rent, lease, sell and otherwise deal with real property and its appurtenances and fixtures, of any kind or description, as the partnership may determine, but particularly a tract of land and premises situated in the City of Wilmington, New Castle County, Delaware, at 1702 Lovering Avenue and 1701 Shallcross Avenue. It is the intention of the parties hereto, as their initial project, to purchase and rehabilitate the structures at that location and to lease units within that structure as commercial or office space.
(b) To do, in accordance with decision made pursuant to this Agreement, all things necessary or desirable in connection with the foregoing or otherwise contemplated by this Agreement.
(c) To engage in any other business or activity as the partners shall determine. [95]

The record indicates Kalil Associates substantially completed its undertakings in or around 2000, when Kalil LP took over all of Kalil Associates' responsibilities regarding the Property other than holding title.[96] The timing and completeness of this transfer is supported by Palmarella's affidavit, his correspondence with Settlor, the option agreement, and actions by Kalil LP

---

[94] Allan G. Donn, Robert W. Hillman & Donald J. Weidner, The Revised Uniform Partnership Act § 503 cmt. 9 (Oct. 2017); 6 *Del. C.* § 15-503(b)(3).

[95] Pet'r Ex. 6, Kalil Associates Partnership Agreement, § 3. 1701 Shallcross Avenue was later subdivided, and Kalil Associates retained a portion of that parcel as part of the Property. *See supra*, note 5.

[96] Kalil LP's partnership agreement states its purpose is to "acquire, hold, sell, invest, and otherwise deal with various investments in real estate," and that its principal office was at the Property. Pet'r Ex. 7K, ¶¶ 3, 4.

(including receiving rental income, paying taxes, and paying an amount for Respondent's share based on the Property's value). Kalil Associates still owned the Property after Kalil LP assumed all other undertakings, but it is undisputed that this was a mistake and that neither Settlor's counsel nor Kalil LP's partners knew about that mistake. The Property's rent has been paid to Kalil LP, leaving no resources for Kalil Associates. There is no evidence in the record that Kalil Associates took any action with regard to the Property after Kalil LP was created. I therefore conclude that it is equitable to wind up Kalil Associates.

Respondent fails to demonstrate a genuine issue of material fact with regard to whether Kalil Associates should continue to formally own the Property. Respondent fails to refute record evidence of his own past and current belief and acceptance that Kalil LP owned the Property. Respondent treated Kalil LP as the Property's owner when he signed the 2001 option agreement stating Kalil LP owned the Property.[97] Respondent also treated Kalil LP as the owner of the Property in 2010, when Respondent sold his interest in Kalil LP for an agreed-upon price explicitly derived from the Property's value at the time of the transaction.[98] Palmarella's affidavit describing Respondent's buyout is corroborated by a promissory note from Settlor to Kalil LP for the amount of

---

[97] Pet'r Ex. 7M.
[98] Palmarella Aff. ¶ 26.

Respondent's buyout, and a trust agreement for Jacqueline's benefit signed by Respondent, which Palmarella affirmed was supposed to be funded from the buyout.[99] Finally, in this very action, Respondent claims his share of Kalil LP was undervalued, referencing the value of the Property and the building thereon.[100] Respondent's simultaneous argument that Kalil LP does *not* own the property is undermined by his previous actions and litigation positions, and fails to demonstrate a genuine issue of material fact that would preclude judicial dissolution on Petitioner's motion for summary judgment.

Petitioner seeks permission to wind up Kalil Associates and convey the Property to Kalil LP. Based on the record before me, I cannot provide any more specific instructions at this time on winding up Kalil Associates' affairs. "The legal representative of the last surviving partner may wind up a partnership's business or affairs."[101] And "[t]he persons winding up the partnership's business or affairs may, in the name of, and for and on behalf of, the partnership … dispose of and convey the partnership's property."[102] If Settlor was the last surviving partner, Petitioner, as executor of Settlor's estate, would have statutory authority to wind up Kalil Associates and convey the Property to Kalil LP.

---

[99] Pet'r Exs. 7O, 7P.
[100] Resp't. Response at 9-10.
[101] 6 *Del. C.* § 15-803(b).
[102] *Id.* § 15-803(c).

But the record does not prove Settlor was the last surviving partner. Kalil Associates' partnership agreement states that a partner's death creates an obligation by that partner's executor to give written notice to the living partner, which in turn vests in the living partner a right to purchase the deceased partner's interest.[103] If any portion of the deceased partner's interest is not purchased, "the holder or successor to such unpurchased interest shall remain a partner" subject to requirements that the living partner consent and the successor execute an instrument adopting the partnership agreement.[104]

The record contains no allegation or evidence as to whether this procedure was followed when Claire predeceased Settlor. Claire assigned the economic rights of her general partnership interest to her own trust.[105] The trustee(s) and beneficiary(ies) of her trust are not identified in the record. I cannot discern whether Settlor assumed Claire's interest in Kalil Associates (by the above procedure or by some other means) and became the sole surviving partner, or whether Claire's interest went to some other "holder or successor" who then became a partner. I cannot state with certainty that Settlor was the sole surviving partner and that Petitioner therefore has authority to wind up Kalil Associates. I therefore request a status update from the parties within thirty (30) days of the date

---

[103] Pet'r Ex. 6 ¶¶ 15(b), (c).
[104] *Id.* ¶¶ 15(c), 16.
[105] Pet. ¶ 41.

of this report being adopted by the Court as to whether additional Court instructions are necessary regarding the winding up of Kalil Associates. If they are, I request briefing on that issue on a stipulated schedule.

For the foregoing reasons, I recommend the Court grant Petitioner's motion for summary judgment on Count II, seeking dissolution of Kalil Associates, but reserve decision on instructions for winding up Kalil Associates.

### D. Respondent's claims are untimely.

Respondent asserts several claims regarding Settlor's testamentary documents and the administration of Settlor's estate. Petitioner asserts that Respondent's claims are statutorily time-barred. Respondent replied that he requested discovery and challenged Settlor's estate documents to Petitioner's attorneys, and that he complained to the Court that his entreaties were being ignored.[106] These alleged difficulties do not excuse Respondent's failures to assert his claims to this Court before the non-claim statutes and statutes of limitation expired.

---

[106] On exception, Respondent repeated that his claims were late because Petitioner withheld discovery. Respondent did not make any filing in this case – including any request for discovery – until July 20, 2015, after the expiration of the periods for bringing his claims. It was incumbent upon Respondent to file his claims first, then seek discovery within the parameters set by his claims and any asserted defenses thereto. Any alleged failure to receive discovery was not contested before the applicable periods ran, and would have been relevant and justiciable only after Respondent asserted his claims. Respondent's exceptions are dismissed. Petitioner's complaint that Respondent's exceptions were untimely is dismissed as moot.

1. *Respondent's claims against the 1997 Trust and its amendments are untimely.*

Respondent asserts two claims against the 1997 Trust as amended. Respondent seeks $200,000, which Respondent argues was incorrectly debited from his share under the 1997 Trust as amended because Settlor and Claire forgave a promissory note in that amount.[107] Respondent also proposes distributing Petitioner's promissory note to Settlor, which is part of Settlor's residuary estate which Settlor's will states should be distributed according to the 1997 Trust, equally among Respondent, Janice, and Laura, regardless of the terms of the 1997 Trust as amended.

Pursuant to 12 *Del. C.* § 3546, a challenge to the 1997 Trust as amended, which was specifically referred to in Settlor's will, must have been brought "in the time in which a petition for review of a will could be filed." Section 1309 provides this period is six months from the entry of the order of probate.[108] This limitation period is strictly applied to "effectuate the public policy favoring the prompt and orderly settlement of estates."[109]

The Register of Wills admitted Settlor's will to probate on January 16, 2015, so the six-month period for challenging the will and 1997 Trust ended on July 15,

---

[107] Resp't Response at 5-6.
[108] 12 *Del. C.* § 1309.
[109] *Disabatino v. Diferdinando*, 2001 WL 812014, at *2 (Del Ch. July 9, 2001) (citing *Criscoe v. Derooy*, 384 A.2d 627, 629 (Del. Ch. 1978)).

2015.[110]  Respondent did not seek review of any of Settlor's testamentary documents in this Court during that time.  Petitioner filed the petition in this action on May 20, 2015.  On July 15, 2015, having not received any challenges to the will or any response to the petition from Respondent, Petitioner filed a motion for default judgment against Respondent.  Upon receiving the motion for default judgment, Respondent wrote Petitioner and copied the Court on July 20, 2015, expressing discontent with the April 25, 2014, Fifth Amendment to the 1997 Trust.[111]  Petitioner stipulated to an extension of time for Respondent to answer the Petition, which then-Master LeGrow granted, giving Respondent an extra sixty days to respond.[112]  On September 14, 2015, Respondent filed a "motion" seeking to invalidate the 1997 Trust's Fifth Amendment and seeking $56,000 from the estate he claimed he should have received in connection with the Kalil LP buyout.[113]  Then-Master LeGrow granted Respondent an additional extension to formally answer the petition.[114]  Respondent answered and counterclaimed on November 2, 2015, asking the Court to reverse the deduction in the 1997 Trust's Fifth Amendment, equally distribute Respondent and Janice's "debt among all

---

[110] Pet'r Reply Br. Ex. A.
[111] Docket Item ("D.I.") 12.
[112] D.I. 13, 15.
[113] D.I. 24.
[114] D.I. 30.

siblings," and pay Respondent $51,250.00 he allegedly did not receive in connection with the Kalil LP buyout.[115]

Respondent first sought judicial relief for his concerns about the 1997 Trust and its amendments in September 2015, more than six months after Settlor's pourover will was admitted to probate (and four months after receiving detailed notice of the 1997 Trust and Petitioner's interpretation of it via the petition). An interested person's right to ask the Court to review a will, and any trust referred to therein, is open for six months upon admission to probate, but at the close of that period, the right ceases to exist.[116] Then-Master LeGrow's extension of time to answer the petition did not and could not extend the statutory period for Respondent to raise his own claims against Settlor's 1997 Trust. I recommend the Court deny Respondent's motion for summary judgment and grant Petitioner's motion on the basis that Respondent's claims against the 1997 Trust and its amendments are untimely.

2. *Respondent may not amend his pleadings to assert Settlor breached a contract to make a legacy by amending the 1993 Supplemental Trust Agreement; and, any such claim would be untimely.*

Respondent also takes issue with the 1989 Trust and the 1993 Supplemental Trust Agreement. Respondent asserts the 1993 Supplemental Trust Agreement

---

[115] D.I. 37. Respondent did not contest the handling of Settlor's estate before the Register of Wills until September 14, 2016. Pet'r Reply Br. Ex. A.
[116] *Moore v. Graybeal*, 1989 WL 17430, at *6 (Del. Ch. Feb. 24, 1989).

should be disregarded as it pertains to Respondent. Respondent alleges the 1993

Supplemental Trust Agreement decreased Respondent's share under the 1989 Trust

because Settlor gave Respondent a 24% stock ownership gift in Compu-Val, the

family business, as part of an advanced inheritance.[117] Respondent asserts he and

Settlor later agreed Respondent would return his gifted shares in Compu-Val in

exchange for his full inheritance.[118] Respondent concludes that in distributing the

1989 Trust's property, the 1993 Supplemental Trust Agreement should be

disregarded as to Respondent.

Petitioner argues this claim is also statutorily time-barred. Petitioner cites

12 *Del. C.* § 2102(a), which imposes an eight-month statute of limitations period

for any claim against an estate that arose before the death of the decedent.[119] The

eight-month limitation period applies to claims against a revocable trust arising

prior to the death of the trustor.[120]

Respondent raised his claim regarding the 1993 Supplemental Trust

Agreement for the first time in the February 2017 pretrial stipulation.[121]

Respondent's Answer and motion to amend (which I accepted as part of his

Answer in lieu of requiring an amended Answer) did not claim that the 1993

---

[117] Pet'r Ex. 4 ¶ (C).
[118] *See* Resp't Ans. Br. Tab 1 (Transfer Certificate from James P. Kalil to James Kalil Revocable Trust, dated June 9, 1996, for 24 shares).
[119] 12 *Del. C.* § 2102.
[120] 12 *Del. C.* § 3337.
[121] D.I. 71, ¶ 4(b); D.I. 70, ¶ (b).

Supplemental Trust Agreement should be set aside.[122]  Petitioner objected in the

pretrial stipulation:  "Petitioner does not believe this request for relief has been

properly pleaded and therefor[e] is not properly before the Court."[123]  Respondent

did not seek leave to amend his pleadings, but rather, on March 3, 2017, argued

that Petitioner was aware of the circumstances underlying Respondent's claim.[124]

Because the pretrial conference was cancelled, Petitioner's objection to

Respondent's claim for relief regarding the 1993 Supplemental Trust Agreement

was never heard by the Court.  I address it now.

Generally, a party must plead a short and plain statement of a claim for relief

showing that the pleader is entitled to relief, and a demand for judgment for the

relief to which the party deems itself entitled.[125]  Court of Chancery Rule 15

permits adjudication of issues not raised by the pleadings by express or implied

consent of the parties.  If evidence is objected to on the ground that it is not within

the issues made by the pleadings, "the court may allow the pleadings to be

amended and shall do so freely when the presentation of the merits of the action

will be subserved thereby and the objecting party fails to satisfy the court that the

---

[122] Ans. ¶¶ 12-13 (answering Petitioner's allegation about the execution of the 1993 Supplemental Trust Agreement by stating, "Unknown", and answering Petitioner's allegation that the 1993 Supplemental Trust Agreement "changed the dispositive scheme of the 1989 Trust to divide the residue 1/3 to Janice, 1/3 to Laura, 1/6 to James, Jr. and 1/6 to Donald" by stating, "Agreed"); Mot. to Amend (D.I. 54).
[123] D.I. 71, ¶ 4(b).
[124] D.I. 76 at 1-2.
[125] Ct. Ch. R. 8(a).

admission of such evidence would prejudice him in maintaining his action or defense upon the merits."[126] While Rule 15 provides in effect that amendments of the pleadings are to be freely granted, it remains a discretionary matter for the judge.[127]

Respondent asserted his claim to void the 1993 Supplemental Trust Agreement after discovery was complete, on the eve of the scheduled trial. Under the scheduling order, Petitioner had no opportunity to take discovery into Respondent's claim. Respondent had already been permitted to amend his complaint once, over Petitioner's objection. None of those allegations concerned the effect of the 1993 Supplemental Trust Agreement.

Respondent's argument that Petitioner was aware of Settlor's alleged contract to modify the 1993 Supplemental Trust Agreement fails to indicate Petitioner had notice that Respondent was going to challenge that Agreement in this case. To the contrary, Respondent's pleadings indicated some degree of acquiescence to the 1993 Supplemental Trust Agreement until just days before trial. Respondent's Answer "agreed" that the 1993 Supplemental Trust Agreement "changed the dispositive scheme of the 1989 Trust" and did not allege any reason to disturb the 1993 Supplemental Trust Agreement. I conclude Respondent may

---

[126] Ct. Ch. R. 15(b); *see Norberg v. Security Storage Co. of Washington*, 2000 WL 1375868, at *4-5 (Del. Ch. Sept. 19, 2000) (applying Rule 15(b) in the summary judgment context).
[127] *Laird v. Buckley*, 539 A.2d 1076, 1079 (Del. 1988).

not amend his pleadings to add a claim to void the 1993 Supplemental Trust Agreement.

Even if Respondent's claim to set aside the 1993 Supplemental Trust Agreement were considered, it would be untimely. As I read it, Respondent's claim is based on an alleged contract to make a testamentary disposition.[128] Respondent asserts that the 1993 Supplemental Trust Agreement's diminishment of Respondent's share of the 1989 Trust was based on Settlor having given Respondent 24% ownership in Compu-Val. Respondent further asserts that in or around 1996, he and Settlor agreed that Respondent would return his share of Compu-Val in exchange for his full inheritance. Settlor did not amend the 1989 Trust or 1993 Supplemental Trust Agreement in accordance with any such contract.

A claim for breach of a contract to make a legacy arises at the death of the party offering to make the will.[129] Section 2102(b) states that all claims that arise at the death of the decedent are barred against the estate within six months after

---

[128] *See* 6 Del. C. § 2715 ("No action shall be brought to charge the personal representatives or heirs of any deceased person upon any agreement to make a will of real or personal property, or to give a legacy or make a devise, unless such agreement is reduced to writing, or some memorandum or note thereof is signed by the person whose personal representatives or heirs are sought to be charged, or some other person lawfully authorized in writing, by the decedent, to sign for in the decedent's absence."). Settlor's disposition to Respondent under the 1989 Trust was testamentary. *See* Pet'r Ex. 2, ¶ (I)(B)(2)(b) (distributing trust property to Respondent and his siblings only upon the death of both Settlor and his wife).
[129] *Eaton v. Eaton*, 2005 WL 3529110, at *6 (Del. Ch. Dec. 19, 2005).

they arise.[130] Section 2102 is a "non-claim" statute that fixes a specific time within which claims against a decedent's estate must be brought, otherwise the claim is forfeited.[131] The intent and purpose of "non-claim" statutes is to compel claimants to bring their claims in a timely manner so the estate can be settled in a reasonable time.[132] Settlor died on November 8, 2014, so the time for Respondent to claim Settlor breached an agreement to make a legacy expired May 8, 2015. Respondent did not assert his claim that Settlor breached a contract to make a legacy until February 2017. Even if Respondent were permitted to amend his pleadings to assert this claim, the claim would be barred as untimely.[133] I recommend the Court grant Petitioner's motion for summary judgment, and deny Respondent's, with regard to Respondent's claim to set aside the 1993 Supplemental Trust Agreement.

3. *Respondent's claim that he received insufficient consideration for his share in Kalil LP is untimely.*

Lastly, Respondent claims that the $166,250 he received as consideration for his interest in Kalil LP was insufficient and that Kalil LP was undervalued at the time of the transaction. Respondent appears to assert that when he contractually tendered his interest in Kalil LP to the remaining partners, the consideration he

---

[130] *See id.* (noting the "general rule" that a cause of action for breach of a contract to make a will arises at the death of the decedent and is governed by 12 *Del. C.* § 2102(b)).

[131] *Estate of Holton*, 1976 WL 5206, at *1-2 (Del. Ch. Aug. 17, 1976).

[132] *Id.*

[133] This claim would be untimely even if such amendment related back to Respondent's September 14, 2015, "motion" in which he first sought relief from this Court. *See* Ct. Ch. R. 15(c).

received was insufficient given the actual value of Kalil LP's assets (*i.e.*, the Property) at the time. Respondent seeks monetary damages in the amount of the alleged difference between what he received and what he should have received.[134] Petitioner claims Respondent agreed to the Kalil LP buyout and therefore is barred from challenging it. In addition, Petitioner argues the claim (whether equitable or legal) is untimely, either pursuant to the statute of limitations at 10 *Del. C.* § 8106, or pursuant to a laches analysis.

Respondent's theory underlying this claim is unclear, so it is difficult to categorize the claim as legal or equitable. Respondent seeks legal relief in the form of monetary damages. I therefore evaluate the timeliness of Respondent's claim pursuant to 10 *Del. C.* § 8106, which establishes a three-year statute of limitations period for contract claims, negligent misrepresentation, and equitable fraud.[135] The transaction that tendered Respondent's interest in Kalil LP to the remaining partners closed on or around March 21, 2010, so the limitations period ended on or around March 21, 2013.[136] Respondent first asserted a claim regarding

---

[134] Resp't Response at 9-10.

[135] *See Kraft v. WisdomTree Inv. Inc.*, 145 A.3d 969, 977-78, 981, 983 (Del. Ch. 2016) (recommending application of statutes of limitations to legal and equitable claims seeking legal relief); *Krahmer v. Christies Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) (noting Section 8106 imposes a three-year limitations period for claims of negligent misrepresentation and equitable fraud).

[136] Pet'r Op. Br. at 33. The promissory note financing the buyout is dated April 13, 2010. Pet'r Ex. 7O.

the Kalil LP transaction in September 2015.[137]  Absent tolling, unusual conditions,

or extraordinary circumstances,[138] which Respondent has not pled and for which I

see no basis, Respondent's claim regarding insufficient consideration for his

interest in Kalil LP is time-barred.  I therefore need not address whether

Respondent acquiesced to the consideration he received.

> **E. Fees generated in seeking reformation and defending against Respondent's claims against Settlor's Trusts may be paid out of Settlor's trusts, but fees generated in seeking dissolution of Kalil Associates and defending against Respondent's claim against Kalil LP may not.**

Petitioner asks for payment of his attorneys' fees from Settlor's trust.

Respondent opposes that request, asserting Petitioner has brought this action in

Petitioner's own interest.

Delaware common law permits payment of attorneys' fees out of a trust

> (i) where the attorney's services are necessary for the proper administration of the trust, or (ii) where the services otherwise result in a benefit to the trust.  In either circumstance the trustee may charge the trust estate with the expenses of litigation, even if the litigation is unsuccessful.[139]

Title 12, Section 3584 of the Delaware Code states:

> In a judicial proceeding involving a trust, the court, as justice and equity may require, may award costs and expenses, including

---

[137] D.I. 24 (alleging the $166,000 transaction was never complete:  "Though $110,000 was paid to my daughter's educational fund the remaining $56,000 was to go to me and I am therefore owed those funds by the estate.")

[138] *See Kraft*, 145 A.3d at 977-78, 981-93.

[139] *Merrill Lynch Trust Co., FSB v. Campbell,* 2009 WL 2913893, at *11 (Del. Ch. Sept. 2, 2009) (internal citation omitted).

45

> reasonable attorneys' fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

The decision whether or not to award fees is discretionary.[140]

I see no evidence that Petitioner brought this action in his own interest. Settlor named Petitioner as sole trustee of the 1997 Trust and as executor of Settlor's estate. Petitioner therefore has a duty to administer Settlor's estate plan as Settlor intended. Based on the record presented on summary judgment, Petitioner had a colorable basis to file this action to remedy mistakes by Settlor that frustrated Settlor's testamentary intent.[141] While I do not grant the reformation Petitioner sought, I believe the petition for reformation sought a benefit for the 1997 Trust, namely, funding it so that it comported with Settlor's intent. While reformation would have benefitted Petitioner, it also would have benefitted Laura and Jacqueline. Petitioner and his siblings also engaged in extensive settlement negotiations, indicating Petitioner attempted to be conciliatory and limit exposure to attorneys' fees. I conclude Petitioner's reasonable fees and costs for services provided in seeking reformation of the 1997 Trust, and in countering Respondent's claims against the 1997 and 1989 Trusts as amended, may be paid out of those trusts. Because my report leaves the Account titled under the 1989 Trust, I

---

[140] *Paradee v. Paradee,* 2010 WL 3959604, at *15 (Del. Ch. Oct. 5, 2010).
[141] *See Matter of The Hawk Mountain Trust Dated Dec. 12, 2002*, 2015 WL 5243328, at *5 (Del. Ch. Sept. 8, 2015) (awarding fees out of a trust for an action that was dismissed, where the petitioner had "at least a colorable basis" for bringing that action).

conclude that the 1989 Trust was also "involved" in this proceeding, and that justice and equity require payment of those fees and costs out of the 1989 Trust if necessary due to lack of funds in the 1997 Trust.[142]

Both the common law and statutory grounds for paying fees out of a trust require a trust to be the subject of the controversy. Petitioner's request for judicial dissolution of Kalil Associates and transfer of the Property does not place any trust as the subject of the controversy. Neither does Respondent's claim regarding the Kalil LP buyout. While Kalil LP and Kalil Associates were significant components of Settlor's estate plan, they operated in parallel to Settlor's trusts and are neither beneficial nor necessary to the proper administration of those trusts. Instead, Petitioner's requested remedy benefits Kalil LP. Fees and costs for services provided in connection with the dissolution of Kalil Associates and the Kalil LP buyout may not be paid out of either of Settlor's trusts.

Upon this report being adopted by the Court, Petitioner's counsel shall distribute a demand for attorneys' fees and costs with supporting documentation. If the parties cannot reach agreement on the amount of attorneys' fees and costs to be awarded, then Petitioner's counsel shall make a prompt application.

---

[142] *See* 12 *Del. C.* § 3584.

## III. Conclusion

For the foregoing reasons, I recommend the Court deny Petitioner's motion for summary judgment on Petitioner's request for reformation (Count I), grant Petitioner's motion on Petitioner's request for dissolution of Kalil Associates (Count II), and grant Petitioner's motion on Respondent's untimely claims against Settlor's trusts and estate. I recommend the Court deny Respondent's motion for summary judgment. I recommend the Court grant Petitioner's request for fees incurred in connection with the 1989 and 1997 Trusts, but deny it for fees incurred in connection with Kalil Associates and Kalil LP.

Janice's counterclaim regarding the 1989 Trust was not reviewed on summary judgment. If and when this report is adopted by the Court, the parties shall submit a status update and scheduling order for proceeding on Janice's counterclaim.

This is a final report pursuant to Court of Chancery Rule 144. Due to Respondent's reliance on the prison mail system, the period for filing a notice of exceptions is extended to twenty (20) days.

Respectfully,

*/s/ Morgan T. Zurn*

Master in Chancery